Nos. 25-1738 & 25-1872

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

PENSKE TRUCK LEASING CO., L.P.,

*Plaintiff-Appellant-Cross-Appellee*

v.

CENTRAL STATES, SOUTHEAST & SOUTHWEST
AREAS PENSION PLAN, and the TRUSTEES OF
CENTRAL STATES, SOUTHEAST & SOUTHWEST
AREAS PENSION FUND,

*Defendants-Appellees-Cross-Appellants*

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
District Court Case No. 1:21-cv-05518
Honorable Andrea R. Wood

**REPLY/CROSS-APPELLEE'S BRIEF FOR
PENSKE TRUCK LEASING CO., L.P.**

Sarah Bryan Fask
LITTLER MENDELSON, P.C.
1601 Cherry Street
Suite 1400
Philadelphia, PA 19102
(267) 402-3070
sfask@littler.com

Lawerence D. Levien
LITTLER MENDELSON, P.C.
815 Connecticut Avenue NW
Suite 400
Washington, DC 20006
(202) 772-2535
llevien@littler.com

*Attorneys for Plaintiff-Appellant-
Cross-Appellee*

**TABLE OF CONTENTS**

I.     INTRODUCTION..................................................................................... 1

II.    JURISDICTIONAL STATEMENT........................................................ 2

III.   COUNTER STATEMENT OF THE ISSUE........................................ 3

IV.    COUNTER STATEMENT OF THE CASE ......................................... 3

V.     SUMMARY OF THE ARGUMENT...................................................... 6

VI.    ARGUMENT .......................................................................................... 7

     A.    Central States Fails to Rebut Penske's Arguments.............................. 7

         1.    The Trustees overstepped their authority.................................. 7

             a.    The Trust Agreement does not authorize the
Trustees' decision................................................. 7

             b.    Central States cannot shore up its decision now............ 11

             c.    Central States could not have rejected the expired
2016 CBA................................................................ 13

             d.    Central States did not reject the Participation
Agreement. ...................................................... 15

             e.    Central States concedes the district court erred by
not reviewing the Trust Agreement *de novo* first........... 17

             f.    Central States' remaining arguments are meritless...... 18

         2.    The Trustees' decision was arbitrary and capricious............... 20

             a.    The Trustees' result was predetermined, and their
investigation was a sham. ............................................ 21

             b.    The Trustees' decision reached its conclusion
without explanation....................................................... 23

             c.    Central States did not follow its own process................. 24

             d.    Central States cannot recast its "questions" as
"inconsistencies"........................................................... 26

3.  The Expulsion Provision violates 29 U.S.C. §1394(b). .............. 30

    a.  The Expulsion Provision is subject to 29 U.S.C. § 1394(b). ......................................................... 30

    b.  The Expulsion Provision does not operate uniformly. ......................................................... 33

4.  Central States cannot force Penske (or any other employer) to violate the NLRA. ................................................... 35

B.  The District Court Correctly Dismissed Central States' Claim For Declaratory Judgment. .................................................. 37

1.  Central States' Count II is subject to mandatory arbitration. ......................................................................... 38

    a.  Central States' failure to issue a withdrawal liability assessment does not save its claim. ................. 40

    b.  Determining the date of withdrawal is subject to mandatory arbitration even if appellate jurisdiction exists over unrelated contribution issues. ...................... 41

2.  If this Court addresses Central States' Count II on the merits, Penske's obligation to contribute ceased on May 6, 2022. ................................................................................. 46

3.  The district court should not be forced to retain jurisdiction. ........................................................................ 49

VII.  CONCLUSION ............................................................................... 51

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ............................................................................... 38

*BeerMart v. Stroh Brewery,*
   804 F.2d 409 (7th Cir. 1986) ............................................................... 18

*Borntrager v. Central States,*
   577 F.3d 913 (8th Cir. 2009) ............................................................... 18

*Brown v. Blue Cross & Blue Shield of Alabama,*
   898 F.2d 1556 (11th Cir. 1990) ........................................................... 20

*Buttron v. Sheahan,*
   Civ. A. No. 00-4551, 2001 WL 111028 (N.D. Ill. Feb. 2, 2001) ........... 51

*Caesars Ent. Corp. v. Pension Plan of Nat. Ret. Fund,*
   No. 15-CV-138, 2015 WL 7254208 (S.D.N.Y. Nov. 17, 2015) .............. 32

*Catholic Health Partners v. Carelogistics, LLC,*
   973 F.Supp.2d 787 (N.D. Ohio 2013) .................................................. 41

*Central Hardware v. Central States,*
   770 F.2d 106 (8th Cir. 1985) ............................................................... 18

*Central States v. Bomar Nat'l,*
   253 F.3d 1011 (7th Cir. 2001) ............................................................. 39

*Central States v. Metcalf Moving & Storage Co.,*
   1996 WL 341405 (N.D. Ill. Jun. 1996) ................................................ 42

*Central States v. Rail Terminal Services,*
   2019 WL 2326002 (N.D. Ill. May 31, 2019) ............................. 42, 43, 43

*Central States v. Transervice Logistics,*
   56 F.4th 516 (7th Cir. 2022) ......................................................... 14, 15

*Cler v. Illinois Educ. Ass'n.,*
   423 F.3d 726 (7th Cir. 2005) ............................................................... 34

*Cofire Paving Corp.,*
   359 N.L.R.B. 180 (2012) ..................................................................... 36

*Combs v. Leishman,*
    691 F. Supp. 424 (D.D.C. 1988) ........................................................... 43

*Cont'l Cas. Co. v. Am. Nat'l Inc. Co.,*
    417 F.3d 727 (7th Cir. 2005) ............................................................... 38

*Contemporary Cars, Inc. v. NLRB,*
    814 F.3d 859 (7th Cir. 2016) ............................................................... 36

*NLRB v. Dominick's Finer Foods,*
    28 F.3d 678 (7th Cir. 1994) .................................................................... 4

*Farr v. Hartford Life,*
    322 F. App'x 622 (10th Cir. 2009) ....................................................... 19

*Gallo v. Amoco Corp.,*
    102 F.3d 918 (7th Cir. 1996) ......................................................*passim*

*Halpin v. W.W. Grainger, Inc.,*
    982 F.2d 682 (7th Cir. 1992) ........................................................ 12, 16

*Jos. Schlitz Brewing Co. v. Milwaukee Workers' Pension Plan,*
    3 F.3d 994 (7th Cir. 1993) ........................................................... 32, 33

*Kaminski v. Elite Staffing,*
    23 F.4th 774 (7th Cir. 2022) ............................................................... 37

*Kelly v. McGraw-Hill Co.,*
    865 F.Supp.2d 912 (N.D. Ill. 2012) .................................................... 18

*Kunin v. Benefit Tr. Life Ins. Co.,*
    910 F.2d 534 (9th Cir. 1990) ............................................................... 26

*Laborers Health & Welfare Trust Fund v. Advanced Lightweight*
    *Concrete,*
    484 U.S. 539 (1988) ............................................................................ 14

*Lancaster v. Norfolk & W. Ry. Co.,*
    773 F.2d 807 (7th Cir. 1985) ............................................................... 44

*Litton Fin. Printing Div. v. NLRB,*
    501 U.S. 190 (1991) ...................................................................... 14, 15

*Loja v. Main St. Acquisition,*
    906 F.3d 680 (7th Cir. 2018) ........................................................ 17, 30

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ....................................................................... 50

*M&G Polymers USA v. Tackett,*
    574 U.S. 427 (2015) ....................................................................... 14

*Marecek v. Bellsouth Telecomms.,*
    49 F.3d 702 (11th Cir. 1995) ....................................................... 12

*Medcom Holding Co. v. Baxter Travenol Lab.,*
    984 F.2d 223 (7th Cir. 1993) ......................................................... 8

*Midwest Operating Eng'rs Welfare Fund v. Cleveland Quarry,*
    844 F.3d 627 (7th Cir. 2016) ....................................................... 37

*Midwest Operating Eng'rs v. Dredge,*
    147 F. Supp. 3d 724 (N.D. Ill. 2015) .......................................... 36

*Militello v. Central States,*
    360 F.3d 681 (7th Cir. 2004) ....................................................... 26

*Mondry v. Am. Family Mut. Ins.,*
    557 F.3d 781 (7th Cir. 2009) ....................................................... 15

*Niro v. Fearn Intern., Inc.,*
    827 F.2d 173 (7th Cir. 1987) ....................................................... 51

*NLRB v. Dominick's Finer Foods,*
    28 F.3d 678 (7th Cir. 1994) ........................................................... 4

*NLRB v. Noel Canning,*
    573 F.3d 490 (2014) ....................................................................... 37

*NLRB v. Seaport Printing & Ad. Specialties,*
    589 F.3d 812 (5th Cir. 2009) ....................................................... 36

*Operating Engineers L. 139 v. Gustafson Const. Corp.,*
    258 F.3d 645 (7th Cir. 2001) ....................................................... 17

*Quinn v. Blue Cross and Blue Shield,*
    161 F.3d 472 (7th Cir. 1998) ....................................................... 26

*Robbins v. Admiral Merch. Motor Freight,*
    846 F.2d 1054 (7th Cir.1988) ................................................. 38, 39

*Robbins v. Lady Baltimore Foods,*
    868 F.2d 258 (7th Cir. 1989) ............................................. 3, 39, 40

vi

*Sigmund Cohn Corp. v. District No. 15 Machinists Pension Fund,*
  804 F. Supp. 490 (E.D.N.Y. 1992) ................................................. 33

*Simon v. Pfizer Inc.,*
  398 F.3d 765 (6th Cir. 2005) ........................................................ 41

*Sisters of the Third Order of St. Francis v. SwedishAmerican Group*
  *Health Benefit Trust,*
  901 F.2d 1369 (7th Cir. 1990) ...................................................... 19

*StaffCo of Brooklyn, LLC v. NLRB,*
  888 F.3d 1297 (D.C. Cir. 2018) .................................................... 37

*In re Stericycle Sec. Litig.,*
  35 F.3d 555 ..................................................................................... 7

*Tsareff v. ManWeb Servs.,*
  794 F.3d 841 (7th Cir. 2015) ........................................................ 43

*Trustees of Chicago Truck Drivers Pension Fund v. Chicago Kansas*
  *City Freight Line, Inc.,*
  694 F. Supp. 469 (N.D. Ill. 1988) ................................................. 43

*Univ. Hosps. V. Emerson Elec. Co.,*
  202 F.3d 839 (6th Cir. 2000) ................................................. 12, 24

*Vaught v. Scottsdale Healthcare Corp. Health Plan,*
  546 F.3d 620 (9th Cir. 2008) ........................................................ 19

*Wolf v. Nat'l Shopmen Pension Fund,*
  728 F.2d 182 (3d Cir. 1984) .......................................................... 19

*Yochum v. Barnett Banks,*
  234 F.3d 541 (11th Cir. 2000) ...................................................... 19

**Statutes**

29 U.S.C. § 1103(c)(2) ....................................................................... 48

29 U.S.C. §§ 1381–1405 .................................................................... 30

29 U.S.C. § 1383(a) ........................................................................... 39

29 U.S.C. § 1385(a)(2) ....................................................................... 39

29 U.S.C. § 1385(b) ........................................................................................... 31

29 U.S.C. § 1385(b)(2) ...................................................................................... 31

29 U.S.C. § 1385(b)(2)(A) ................................................................................. 31

29 U.S.C. § 1385(b)(2)(A)(i)............................................................................. 31

29 U.S.C. § 1386............................................................................................... 32

29 U.S.C. § 1391(c)(2) ...................................................................................... 34

29 U.S.C. §1394(b) .....................................................................................*passim*

29 U.S.C. § 1401(a) .....................................................................................*passim*

29 U.S.C. § 1401(b)(2) ...................................................................................... 50

## Other Authorities

Cir. R. 28(b) ....................................................................................................... 2

## I.      INTRODUCTION

Under ERISA, a partial withdrawal (or multiple partial withdrawals) can generate significantly more withdrawal liability for Central States than an employer's complete withdrawal in one year. Given this economic reality, in September 2021, Central States amended its Trust Agreement. With this amendment, Central States tried to give itself the authority to expel a single bargaining unit, thereby triggering a partial withdrawal and increasing the amount of withdrawal liability it could collect.

But neither the Trust Agreement—and its newly amended Expulsion Provision—nor ERISA gives the Trustees the power they sought or tried to exercise three months later against Penske.

Central States' naked attempt to artificially inflate Penske's withdrawal liability fails for several reasons. To start, every argument Central States advances—whether relating to the text of the Expulsion Provision, the "investigation" of Penske's intent, or any other defense of the Trustees' December 2021 decision—lacks support in the plain text of the Expulsion Provision and administrative record. Central States' arguments now are impermissible *post hoc* justifications. Second, the Expulsion Provision itself is subject to and violates 29 U.S.C. § 1394(b)'s "operate and apply" uniformity requirement and the National Labor Relations Act ("NLRA"). Obviously Central States cannot use its Expulsion Provision to force Penske (or any other employer) into a violation of the NLRA.

Finally, Central States' counterclaim, which seeks a declaration that the expulsion of the Local 745 group was effective on December 25, 2021, is an end-run around ERISA's mandatory arbitration provision. For decades, Central States has argued that the question of an employer's withdrawal date must be arbitrated first. Its attempt to backtrack from that position via "careful wordsmithing" is without merit. *See* Appx. 13. The district court properly dismissed Central States' counterclaim and this Court should affirm that part of the district court's decision.

## II.     JURISDICTIONAL STATEMENT

The jurisdictional statement of Central States and its Trustees is neither complete nor correct for two reasons. *See* Cir. R. 28(b); Dkt. No. 19 ("Opposition") at 1.

First, federal jurisdiction still exists over Penske's request for a declaratory judgment regarding Central States' authority under the Trust Agreement. Although Penske and the Local 745 group negotiated out of Central States in 2022, Central States continues to argue that it expelled Penske. *See* Opposition 14. Thus, whether Central States has (or had) the authority to expel the Local 745 group, and whether Central States' decision to do so was arbitrary and capricious, remain live issues. Because Penske has a cognizable interest in a determination of those issues, this Court retains jurisdiction over Penske's claim under ERISA and Section 301(a) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a).

Second, Central States' jurisdictional statement says that this Court has jurisdiction over Count II of its counterclaim pursuant to LMRA § 301(a) and the Declaratory Judgment Act, 28 U.S.C. § 2201. This argument is incorrect. Well-

established law provides that a determination of the date an employer's obligation to contribute to a fund ceases must be decided by an arbitrator under 29 U.S.C. § 1401(a) and is, therefore, outside the subject matter jurisdiction of this Court. *See Robbins v. Lady Baltimore Foods*, 868 F.2d 258, 264 (7th Cir. 1989) (holding the date the employer's obligation to contribute ceased was for an arbitrator to decide). Because this issue forms the basis of the district court's dismissal of Central States' Count II and Central States' appeal to this Court, Penske will address this issue in more detail below. *Infra*, p. 37.

## III.    COUNTER STATEMENT OF THE ISSUE

1. Because ERISA requires mandatory arbitration over the determination of a withdrawal date, did the district court properly dismiss Central States' counterclaim that the Local 745 group's participation fund terminated effective December 25, 2021?

## IV.    COUNTER STATEMENT OF THE CASE

On December 14, 2021, the Trustees decided to expel Penske's Local 745 group effective December 25, 2021, unless Penske agreed to the Trustees' "settlement proposal." Appx. 91. On December 24, 2021, the district court restrained Central States from "taking any action to create a partial withdrawal under 29 U.S.C. § 1385 for Penske, including, but not limited to, ejecting Penske's Local 745 group from the Fund." R. 25 at ¶ 2.

On February 25, 2022, Teamsters Local 135 unilaterally decided that it would not continue to represent Penske's then-unionized employees in Bloomington, Indiana.

3

R.108-3 at 3.[1] Because Penske's Local 135 bargaining unit had also participated in Central States, that disclaimer, in which Penske played no role, triggered a partial withdrawal from Central States. *Id.* at 3–4.

Thus, as of February 2022, Penske knew it faced withdrawal liability in 2022 regardless of what happened vis-à-vis Local 745, Central States, and this litigation. *Id.* at 4. Additionally, the experience of this litigation made Penske recognize that Central States would continue to seek ways to maximize its revenue, regardless of whether legally authorized to do so, and that it would continually amend the Trust Agreement to give it unrestricted power to achieve its objectives. *Id.* Should Central States prevail in this litigation, Penske realized that it would be subject to ongoing partial withdrawals at Central States' whim. *Id.* Because Penske had nine remaining CBAs that required contributions to Central States, Penske faced up to eight separate partial expulsions from Central States (each with their own associated withdrawal liability, like in this case). Penske also realized that this financial exposure to both Penske and its associates was unwarranted, since Central States was slated to become insolvent. *Id.* Thus, Penske's contributions to Central States would not benefit many of Penske's associates anyway. For these reasons, on March 17, 2022, Penske decided to withdraw each of its remaining units from Central States. *Id.*

---

[1] This action is called a "disclaimer of interest." *See NLRB v. Dominick's Finer Foods*, 28 F.3d 678, 682 (7th Cir. 1994).

Meanwhile, on April 6, 2022, the district court denied Penske's motion for a preliminary injunction and vacated the December 24, 2021 temporary restraining order ("TRO"). R. 72.

After the district court's April 6, 2022 decision, Central States did not tell Penske that the Local 745 group was expelled (effective December 25, 2021, April 6, 2022, or any other date). R. 108-3 at 4. Instead, Central States still accepted Penske's contributions on behalf of Penske's Local 745 group. *Id.* From January through April 2022 (including after the district court's April 2022 decision), Penske made monthly contributions to Central States on behalf of its Local 745 group. *Id.* Central States never refunded this money or credited it against Penske's obligations to contribute on behalf of its other bargaining groups. *Id.* at 5. Instead, Central States sent invoices for those other bargaining groups alleging Penske was behind in its payments. *Id.* Those invoices reflected no credit for the contributions Penske made on behalf of its Local 745 group in 2022. *Id.*

On April 30, 2022, Penske and Local 745 finalized their new CBA. *Id.* The new agreement, effective March 1, 2022, did not require contributions to Central States. R. 108-22 at 2, 29.

Penske notified Central States of the new contract on May 2, 2022. R. 108-3 at 5. In its letter, Penske asked Central States to return all contributions it made between March 1, 2022 and May 2, 2022 for the Local 745 group. R. 108-23 at 2. Central States received the May 2, 2022 letter on May 6, 2022. R. 108-3 at 5.

5

Central States did not refund Penske any money. In fact, Central States would not consider Penske's request for almost a year—until a Trustees' meeting in March 2023. R. 112-2 at 1.

## V.    SUMMARY OF THE ARGUMENT

The Trust Agreement does not permit the Trustees to expel a single bargaining unit without rejecting a CBA, participation agreement, or other agreement. Like the district court's decision, Central States' Opposition simply ignores the plain text of the Trust Agreement. Moreover, the Trustees' decision attempting to expel Penske's Local 745 group did not reject a CBA, participation agreement, or other agreement. The Trustees overstepped their authority in "terminating the participation of the Local 745 Group" and may not shore up their decision in litigation. Even if the Trustees had wanted to reject the 2016 CBA, they could not have, because the 2016 CBA had expired. Similarly, the Trustees could not have expelled the Local 745 group by rejecting the Participation Agreement, because by its terms, the Participation Agreement remained in effect until the Trustees "terminate the participation of the Employer" (or Penske, as a whole).

Even if the Trustees had the authority to expel Penske's Local 745 group, their decision to do so was arbitrary and capricious. Moreover, the Trust Agreement's Expulsion Provision is subject to 29 U.S.C. § 1394(b) and does not "operate and apply uniformly." Therefore, it cannot stand. Finally, the Trustees' attempted expulsion of the Local 745 group is unlawful because it forces Penske into violating the NLRA.

6

Moving to Central States' appeal, the district court properly dismissed Count II of Central States' counterclaim, because determining the date the Local 745 group withdrew from Central States is subject to mandatory arbitration.

## VI.     ARGUMENT

### A.     Central States Fails to Rebut Penske's Arguments.

#### 1.     The Trustees overstepped their authority.

##### a.     The Trust Agreement does not authorize the Trustees' decision.

Central States' opposition fails for the same reason the district court's decision must be overturned—they ignore (a) that "Employer" is a defined term in the Trust Agreement; and (b) the actual words and structure of the Expulsion Provision. *See In re Stericycle Sec. Litig.*, 35 F.3d 555, 560 (finding error in the court's "incomplete" analysis).

Central States contends that "the first sentence of the Expulsion Provision [Clauses 1 and 2] authorizes the Trustees to both reject agreements requiring contributions and also to terminate participation in the Fund." Opposition 21. This statement is a sleight of hand, however. The Trust Agreement does not authorize "the Trustees to . . . terminate participation in the Fund," but only to "terminate the participation of an Employer." CSPF Appx. 10–11. Like the district court, Central States' Opposition ignores that "Employer" is a defined term, which means Penske, as a whole. Central States sidesteps this issue (on which Penske spent several pages in its opening brief) saying only that the Expulsion Provision should be "read . . . as a whole." Opposition 23; Penske Opening Brief ("Penske Br.") at 28–29. But reading

a contract "as a whole" does not mean Central States (or a court) can ignore the words of the contract altogether. *See Medcom Holding Co. v. Baxter Travenol Lab.*, 984 F.2d 223, 227 (7th Cir. 1993). Just the opposite, "where a contract contains both general and specific provisions relating to the same subject, the specific provision controls" or else the specific terms would have no meaning. *Id.* Central States can prevail only if this Court ignores the actual language of the Trust Agreement that defines "Employer" as all of Penske's contributing facilities.

Penske does not dispute that under Clause 1 the Trustees' rejection of a CBA, participation agreement, or other agreement may lead to the termination of just one group's participation in the plan. Opposition 21. But Central States' argument that "by authorizing both rejection and termination generally, the first sentence [Clauses 1 and 2] makes clear that the Trustees may terminate participation regardless of whether they are rejecting an active agreement in doing so" is plainly wrong. Opposition 21.

The Trust Agreement does not "authoriz[e] both rejection and termination generally" as Central States claims. *Compare* Opposition 21 *with* CSPF Appx. 10–11. Instead, it authorizes the termination of participation of one or more (but fewer than all) of an Employer's bargaining groups, only through the rejection of a CBA, a participation agreement, or other agreement. And although the Trust Agreement authorizes the expulsion of an Employer, but such expulsion must include *all* the Employer's contributing facilities. *Id.* Central States argues that the "Trustees may terminate participation of fewer than all of the contributing facilities regardless of

8

whether they are rejecting an active agreement in doing so." *Id.* But under the Trust Agreement's own language, if the Trustees are going to expel a contributing facility from participation in Central States without rejecting an CBA, participation agreement, or other agreement, its Trustees must "terminate the participation of [the] Employer." *Id.* And here, the Employer is all of Penske's contributing facilities. Upholding Central States' interpretation that the Trust Agreement allows for termination of fewer than all contributing facilities without the rejection of an agreement is only possible by rewriting the Trust Agreement.

To save its plain-text argument, Central States points to Clause 4 to argue that Clause 2 must mean the Trustees can terminate the participation of a bargaining unit without rejecting any CBA, participation agreement or other agreement. Opposition 21–22. But Clause 3 and Central States' own brief show how this argument fails. Again, Clause 3 discusses the impact of the Trustees' decision: "[a]ny such rejection and/or termination by the Trustees of a collective bargaining agreement, participation agreement or other agreement . . . shall result in the termination of the affected group. . . ." CSPF Appx. 10–11. Clause 3 therefore contemplates both a rejection and/or termination of a CBA, participation agreement or other agreement. This interpretation makes sense, because the Trustees are not signatories to a CBA or a participation agreement, they cannot "terminate" those agreements; they may only be "rejected." But the Trustees could potentially reject by terminating "other agreement[s]" depending on the terms of those "other agreement[s]." *Id.* Under Clause 3, then, this "rejection and/or termination of a

9

collective bargaining agreement, participation agreement, or other agreement" "shall result in the termination of the affected group." *Id.*

Therefore, as Central States observes, "[a] rejection of an agreement may very well result in termination of participation." Opposition 21. So, it is the rejection/termination of an agreement which then leads to the termination of the affected group. Here, Central States rejected no CBA or participation agreement and did not terminate any other agreement.

Central States' interpretation is also meritless because if, as it argues, Clause 3 meant "[a]ny such rejection [of a CBA, participation agreement or other agreement] and/or termination [of a bargaining unit]," that would render the next phrase—"by the Trustees of a collective bargaining agreement participation agreement or other agreement . . ."—meaningless. Given the placement of "by the Trustees of a collective bargaining agreement, participation agreement or other agreement" *after* "[a]ny such rejection and/or termination," the only way to give meaning to every word is for "rejection and/or termination" to mean "rejection and/or termination" of a "collective bargaining agreement, participation agreement or other agreement." Central States offers no alternative meaning for this phrase, as there is none. Clause 3, therefore, provides no support for Central States' termination of the Local 745 Group.

Clause 4 is no more help to Central States than Clause 3, as it further discusses the implications of a decision under Clause 1: "The rejection [of the CBA, participation agreement or other agreement per Clause 1]/[which, under Clause 3, then leads to the] termination of one or more of the Employer's groups that

10

participate in the Fund under this provision shall not affect the continued participation of any other group of the Employer that participates in the Fund." The word "termination" in Clause 4 does not mean a termination of the Employer pursuant to Clause 2, but rather the "termination of the affected group" pursuant to Clause 3.[2]

Clauses 3 and 4 just discuss the impact of a decision under Clause 1. They do not expand on the Trustees' authority to reject a CBA, participation agreement, or other agreement and/or terminate the participation of an Employer.

There is no textual support for Central States' argument that the Expulsion Provision authorizes the Trustees to terminate the participation of just the Local 745 group without rejecting a CBA, participation agreement or other agreement.

### b.    Central States cannot shore up its decision now.

Central States concedes that nothing in the termination decision itself reflects that Trustees rejected the 2016 CBA or a participation agreement. Instead, Central States argues that "by terminating the Local 745 Group, [the Trustees] *rejected* the CBA to the extent it required contributions to the Fund." Opposition 24 (emphasis in original). So, even though the Trustees' decision does not reject the 2016 CBA or a participation agreement, Central States argues that "terminating a group from

---

[2] This interpretation also makes sense because if there is a "termination of the Employer" under Clause 2, there would not be "any other group of the Employer that [still] participate[d] in the Fund" under Clause 4. R. 108-4 at 10–11.

11

participation serves as a[n implicit] rejection of any still active CBAs and participation agreements of that group." Opposition 26.

Central States' sleight of hand is a *post hoc* argument that this Court has found improper. "[I]f the justification that the plan administrator offers in court is inconsistent with the reason that he gave the applicant, the justification will be undermined." *Gallo v. Amoco Corp.*, 102 F.3d 918, 922-23 (7th Cir. 1996); *Halpin v. W.W. Grainger, Inc.*, 982 F.2d 682, 696 (7th Cir. 1992) (rejecting an interpretation of a plan because, even if it were a reasonable interpretation, there was no evidence this interpretation was espoused by the plan at the time of the decision); *Marecek v. Bellsouth Telecomms.*, 49 F.3d 702, 706 (11th Cir. 1995) ("[P]ost hoc explanations are without merit."). At the time of the decision, the Trustees essentially said "we have the authority to terminate the 745 group." Appx. 92. Only now—and recognizing that the Trust Agreement does not permit their action—do the Trustees say they actually rejected the 2016 CBA, even though they did not write that rejection in their decision. This new theory was not "espoused by the plan at the time of the decision" and Central States may not rely on it now. *Halpin*, 982 F.2d at 696.[3]

In response, Central States argues that there is no "requirement that the denial contain a reasoned elaboration of its basis." Opposition 26 (*citing Gallo*, 120 F.3d at

---

[3] Central States' claim that Penske did not challenge the Trustees' authority until litigation and thus waived this argument is meritless. Opposition 26. Until the Trustees shared their final decision with Penske on December 16, 2021, Penske could not have challenged the specific deficiencies of the Trustees' reasoning. And, at that point, the Trustees' decision was final, and the district court was preparing its ruling on Penske's request for a TRO. Appx. 72–92; R. 7, 15, 23, 25.

923). But that argument misses the point. Central States is asking this Court to change the basis for its actual decision. As the Sixth Circuit has observed, this altered justification is not allowed:

> More importantly, it strikes us as problematic to, on one hand, recognize an administrator's discretion to interpret a plan by applying a deferential "arbitrary and capricious" standard of review, yet, on the other hand, allow the administrator to "shore up" a decision after-the-fact by testifying as to the "true" basis for the decision after the matter is in litigation, possible deficiencies in the decision are identified, and an attorney is consulted to defend the decision by developing creative post hoc arguments that can survive deferential review. The concerns inherent in this scenario are even more pronounced where, as here, the administrator has a financial incentive to deny benefits.

*Univ. Hosps. V. Emerson Elec. Co.*, 202 F.3d 839, n.7 (6th Cir. 2000). Here, Central States attempts to "shore up" the decision itself (not just the decision's rationale) by changing it—all to manufacture $10 million of revenue for itself. No law supports its ability to do so.

The Trustees' decision does not reject the 2016 CBA, a participation agreement, or another agreement. And the Trustees' decision does not expel Penske as the Employer. Therefore, the Trustees' decision to "terminate" "the participation of Penske's Local 745 group" cannot stand. Appx. 91. The district court's decision holding otherwise must be reversed.

### c.    Central States could not have rejected the expired 2016 CBA.

Central States' claim that the expired 2016 CBA had not "terminated" and was still in effect (such that they *could* reject it) is legally wrong. Opposition 24. To the

contrary, the Supreme Court held that even though some rights may survive beyond a CBA's effective date through the *status quo* obligations, the CBA does not exist anymore. *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 207 (1991) ("[C]ontractual obligations will cease, in the ordinary course, upon termination of [a CBA] . . . . They *are no longer agreed-upon terms*; they are terms imposed by law.") (emphasis added); *Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete*, 484 U.S. 539 (1988) (holding that any post-CBA-expiration obligation to contribute to a fund was imposed by the NLRA, not by the CBA). In other words, the CBA does not continue forward beyond the date of its expiration. The 2016 CBA was not in effect and Central States could not have rejected it.

In support of its incorrect position, Central States cites to *M&G Polymers USA v. Tackett*, 574 U.S. 427 (2015) and *Central States v. Transervice Logistics*, 56 F.4th 516 (7th Cir. 2022). Opposition 24. But these cases are inapposite. *Tackett* specifically recognizes that parties to a contract can provide for rights that *survive the termination* of their agreement. 574 U.S. at 441–42 ("a [CBA] may provide in explicit terms that certain benefits continue after the agreement's expiration"). Although the agreement has expired and no longer exists, the benefits continue.

Meanwhile, Central States took the statement in *Transervice Logistics* that a CBA could "expire" without "terminating" out of context. Opposition 24. There, this Court discussed an "evergreen clause":

> The expiration date listed in an evergreen clause is merely the first date on which the agreement *could* terminate if timely notice was given. A collective bargaining agreement

14

> can 'expire' without 'terminating.' That's the whole point of an evergreen clause.

*Transervice Logistics*, 56 F.4th at 527 (emphasis in original). But, here, the 2016 CBA was not extended beyond 2021 via an evergreen clause and Central States has never alleged any evergreen clause applied here. *Transervice Logistics'* statement about evergreen clauses does not abrogate the more general principle set out by the Supreme Court in *Litton*: Upon the expiration of a CBA, although the employer may be obligated to maintain the *status quo*; the CBA does not exist anymore. *Litton*, 501 U.S. at 207.

There simply was no CBA in place for the Trustees to reject. Moreover, the Trustees' decision did not even try to reject the expired 2016 CBA between Penske and Local 745. It is only in litigation that Central States is trying to have a "do over."

### d. Central States did not reject the Participation Agreement.

Central States' claim that it could have rejected (and did reject) the Participation Agreement between Penske and Local 745 is even more puzzling. Opposition 24–25.

First, as set forth above, the Trustees' decision contains no decision to reject the Participation Agreement. Appx. 72–92. The Participation Agreement is not even included in the administrative record, which necessarily must include all documents the Trustees considered when making their decision. R. 108-10 at 147–455; *Mondry v. Am. Family Mut. Ins.*, 557 F.3d 781, 801 (7th Cir. 2009) (holding the plan must produce all documents relied upon in making its decision upon request). Moreover, Central States did not produce the Participation Agreement in response to *any*

discovery request, including Penske's request seeking all documents the Trustees considered in arriving at their decision. R. 51-2 at RFP Nos. 11 & 12; *cf.*, R. 48-6 at 2–4 (Central States' submission of a non-Bates stamped version to the district court after Penske identified this deficiency). For Central States to argue that the *mere existence* of the Participation Agreement justifies the decision to expel Penske's Local 745 bargaining group is untenable when Central States did not reject the Participation Agreement. This justification is another impermissible "post hoc argument." *See Halpin*, 982 F.2d at 696; *Gallo*, 102 F.3d at 922–23.

But, even on the merits, Central States' Participation Agreement argument does not pass muster. The Participation Agreement is between Penske Truck Leasing Co., LLP and Teamsters Local Union No. 745. CSPF Appx. 43–45. As Central States agrees, the Participation Agreement remains effective until:

> a) the Trustees decide to terminate the participation of the Employer . . . or b) the Employer is no longer obligated by a contract or statute to contribute to the Fund(s). . . .

*Id.*; Opposition 24. As Central States did not terminate Penske Truck Leasing Co., LLP as an Employer, and section (b) is not applicable, the Participation Agreement remained in effect.[4] Central States' claim that "the Trustees rejected [the]

---

[4] Central States makes no argument that "Employer" in the Participation Agreement means an "individual bargaining unit." *See* Opposition 24–25. Moreover, other references to "Employer" in the Participation Agreement cannot be read logically to mean an "individual bargaining unit." For example, the "Employer Name" is "Penske Truck Leasing Co., LLP." CSPF Appx. 45. Additionally, the "Employer" agreed to be bound by the Trust Agreement and make certain contributions to Central States. *Id.* Penske's Local 745 group (which is simply a collection of unionized, non-managerial employees in Texas) is not a legal entity, does not exist outside of Penske Truck Leasing Co., LLP, and could not bind Penske—the Employer.

Participation Agreement . . . by terminating the Local 745 Group" is false. The Trustees did not reject the Participation Agreement between Penske and Local 745. And, even had they wanted to, by the terms of the Participation Agreement itself, the Trustees must terminate the participation of all of Penske, not just the Local 745 group.[5]

Ultimately, the Trust Agreement does not allow the Trustees to expel a single bargaining unit *without* first rejecting a CBA, participation agreement, or other agreement. Furthermore, nothing in the Trustees' decision rejected a CBA, participation agreement, or other agreement (and the Trustees could not have done so regardless). Because the district court's decision missed both these points, its decision must be reversed.

###### e.    Central States concedes the district court erred by not reviewing the Trust Agreement *de novo* first.

The plain language of the Trust Agreement warrants a reversal because the Trustees overstepped their authority. But the district court also erred by deferring to the Trustees' interpretation of the Trust Agreement without finding any ambiguity in the Trust Agreement. *See* Penske Br. 32–37. The district court's decision thus violates this Court's holding in *Operating Engineers L. 139 v. Gustafson Const. Corp.*,

---

[5] Central States again argues Penske waived any arguments about the applicability of the Participation Agreement because Penske did not affirmatively raise this issue. Opposition 25. But Penske is not required to anticipate each defense Central States could raise. And in any event, Penske may respond to arguments Central States raises for the first time in Penske's reply. *See Loja v. Main St. Acquisition*, 906 F.3d 680, 685 (7th Cir. 2018) ("[I]n a reply brief, an appellant generally may respond to arguments raised for the first time in the appellee's brief.").

258 F.3d 645, 652–55 (7th Cir. 2001), as well as the Eighth Circuit's holdings in *Central Hardware v. Central States*, 770 F.2d 106, 109 (8th Cir. 1985) and *Borntrager v. Central States*, 577 F.3d 913, 920–21 (8th Cir. 2009), and warrants reversal. *Id.*

Although Penske set out this argument in detail, Central States did not address it all, conceding implicitly Penske's argument is correct.

### f.    Central States' remaining arguments are meritless.

Central States makes two other arguments that require quick rebuttals.

First, Central States cites four other provisions from the Trust Agreement claiming they "provide further guidance as to the meaning of the Expulsion Provision." Opposition 22. The broad powers outlined in these four provisions include (1) the Trustees must lawfully administer the Trust; (2) the Trustees shall protect the Trust Fund; (3) the Trustees can do everything necessary to protect the Fund; and (4) the Trustees' power should be construed broadly. These provisions do not discuss the Expulsion Provision at all, let alone overrule the specific limitations in the Expulsion Provision. *BeerMart v. Stroh Brewery*, 804 F.2d 409, 411 (7th Cir. 1986) ("[S]pecific terms control over more general terms[.]"); *Kelly v. McGraw-Hill Co.*, 865 F.Supp.2d 912, 919 (N.D. Ill. 2012) ("[C]ourts may not interpret contracts [so] that provisions would be nullified or rendered meaningless[.]"). Furthermore, because the Trustees did not base their decision on these provisions, they cannot cite them now. *See* Appx. 72–92 and *supra* pp. 11–13.

Second, Central States argues that Penske waived arguments about the revised Expulsion Provision by not bringing them to the attention of the Trustees before the

18

Trustees made their decision. But issue exhaustion is not required. *Wolf v. Nat'l Shopmen Pension Fund*, 728 F.2d 182, 186 (3d Cir. 1984) ("The Pension Fund cites no case, nor are we aware of any case which holds that a district court cannot decide a claim relying on a theory different from that presented to the Trustees of the Pension Fund . . . . [Plaintiff] should not be denied our consideration of this claim simply because she relies on an alternate theory."); *Vaught v. Scottsdale Healthcare Corp. Health Plan*, 546 F.3d 620, 631 (9th Cir. 2008) (concluding "issue exhaustion is not applicable in the ERISA context"); *Yochum v. Barnett Banks*, 234 F.3d 541, 547 (11th Cir. 2000) (permitting arguments in court not presented to the plan); *Farr v. Hartford Life*, 322 F. App'x 622, 628 (10th Cir. 2009) (exhaustion requirement does not "bar subsidiary arguments urged on judicial review") (dicta).

Central States points to *Sisters of the Third Order of St. Francis v. SwedishAmerican Group Health Benefit Trust*, 901 F.2d 1369, 1371 (7th Cir. 1990), for support. Opposition 19. But that case is inapplicable. There, the plaintiff sought a factual finding (whether a malfunctioning car caused a crash as opposed to a drunk driver) but had not pursued that theory before the plan made its final decision, so the administrative record was devoid of any evidence that could support that finding. *SwedishAmerican*, 901 F.2d at 1371. Here, in contrast, Penske presents a purely legal issue that does not depend on facts outside the administrative record: Does the Trust Agreement permit the expulsion of a single bargaining unit *without* the rejection or termination of a collective bargaining agreement, participation agreement, or other agreement? The answer is no.

In any event, before the Trustees made their decision, Penske argued that, even under the amended Expulsion Provision, the Trustees did not have authority to expel Penske's Local 745 group. *See explication* at R. 27 at 25:19–28:1; *see also id.* at 1 (reflecting Albert Madden was present at the hearing) and CSPF Appx. 65 (reflecting Madden summarized Penske's arguments for the Trustees). Central States' representation that Penske was not challenging the Expulsion Provision in its minutes is inaccurate. CSPF Appx. 55–56. Central States' waiver argument must be disregarded.

### 2.    The Trustees' decision was arbitrary and capricious.

Central States surprisingly admits what has been obvious from the start of this expulsion process: its sole reason for attempting to expel the Local 745 group was to engineer at least $10 million of extra withdrawal liability. Opposition 7–8. The Trustees sought to weaponize ERISA's partial withdrawal liability provision to manipulate Penske's participation in the Fund to generate extra money for itself. That maneuver alone, flouting the very purpose of ERISA's withdrawal liability provisions is, itself, an arbitrary action and enough to set aside the Trustees' decision. *See e.g.*, *Brown v. Blue Cross & Blue Shield of Alabama*, 898 F.2d 1556, at n.11 (11th Cir. 1990) (a decision can be set aside if based on improper motives); *see also* Penske Br. 26 n.8 (discussing Congress designed the partial withdrawal rules to discourage employers withdrawing piecemeal to avoid withdrawal liability). Every argument that Central States makes in its brief should be viewed, and discounted, with that bright lens.

Ultimately, even if the Trust Agreement authorizes the Trustees to "terminate" "the participation of Penske's Local 745 group" without first rejecting a CBA, participation agreement, or other agreement, the Trustees' decision was arbitrary and capricious. Appx. 91.

Central States presents myriad arguments to defend its decision. None of them strike at Penske's arguments. As explained in Penske's opening brief, the Trustees' expulsion decision was arbitrary and capricious in four ways. Penske Br. 37–48. Far from countering those arguments, Central States' response only confirms they acted arbitrarily and capriciously.[6]

### a.     The Trustees' result was predetermined, and their investigation was a sham.

A predetermined decision is evidence of an arbitrary and capricious decision. *See* Penske Br. 38. Central States does not dispute that legal conclusion *at all*. Opposition 37–39. The Trustees amended the Trust Agreement with the goal of strengthening their ability to expel a single bargaining unit. CSPF Appx. 311–12, ¶ 8. Then, the Trustees' decision concluded that Penske's intent was immaterial. Appx. 90. Regardless of Penske's intent, the Trustees determined they would not permit all

---

[6] Separately, Central States insinuates that, in 2021, Penske had a plan to coordinate a complete withdrawal in 2022. Opposition 36. These allegations are speculation with no record support. In fact, the record supports precisely the opposite. *See* R.108-10 at 26 (that a number of Penske's CBAs were up for negotiation in 2022 "was not the result of any ill intent or grand design"); *Id.* at 21 (Penske was not responsible for all the CBAs expiring in 2022 as, at least for one, Penske did not make any particular contract duration "a priority"); R. 108-3 at 3–4 (reflecting Penske decided to withdrawal in March 2022); R. 108-18 at 2–18 (internal Penske presentation reflecting the March 2022 decisional process). Central States has produced nothing but conjecture to counter these facts.

Penske's CBAs to expire in the same year. *Id*.; Penske Br. 40. Simply put, Central States' "factual" investigation was a pointless charade.

Central States proffers three responses to these incriminating facts; none of them dispute the Trustees' decision was predetermined. First, Central States claims the process of amending the Trust Agreement "had nothing to do with a potential expulsion of any Penske groups." Opposition 37. The amendment itself, Central States contends, does not support a predetermined decision. *Id*. Yet even if true that the Trustees did not have Penske in mind when they amended the Trust Agreement, that fact alone does not negate the Trustees' intent to use the amendment to trigger a partial withdrawal (should an employer's CBAs all become set to expire in the same year).

Central States next argues that Penske had already submitted all its documentation to the Trustees by the November 2021 Trustees meeting. According to Central States, then, it would not matter if the decision was "predetermined." *Id*. at 38. This fact is immaterial. Penske does not argue that the decision was made in November and just deferred to December (such that the December decision was pre-determined in November). Penske argues that the Trustees decided to expel the Local 745 group well before the "investigation" ever started, and therefore, the entire investigation was a sham.[7]

---

[7]Central States also argues the "investigation" was still ongoing in November. Opposition 34. The November 2021 minutes gives one reason for the deferral: "to allow the parties additional time to reach an agreement that is acceptable to the Fund" R. 108-14 at 21. That Local 769 had not—by the November 2021 meeting—responded to Central States' inquiry, but later provided information, does not mean that the Trustees deferred the decision because they

Finally, Central States argues that Penske's "intent [to withdraw] was not the only relevant factor" and that Penske's intent was a "*sufficient* although not strictly *necessary* factor" to justify the expulsion. *Id*. (emphasis in original). The decision to expel the Local 745 group was simply because Penske had all ten of its CBAs set to expire in 2022 and Central States did not want to take a risk Penske would negotiate out of all ten in one year. Appx. 91–92. Nothing else mattered and the decision was, therefore, predetermined before "Staff" or anyone else did any "investigation." That predetermination makes it arbitrary and capricious.

### b. The Trustees' decision reached its conclusion without explanation.

Central States does not challenge Penske's argument that the Trustees' decision jumped, *without explanation*, to terminating only the Local 745 group, and that these kinds of conclusions without explanations or a "non-sequitur analysis" are hallmarks of an arbitrary and capricious decision. Penske Br. 41–42; *see* Opposition 39. Rather, Central States argues that "it need only explain why it took the actions it did; the Fund does not have to explain why it did not undertake some unreasonable alternative." Opposition 39.

The law does not require Central States to explain why it did not expel Penske (the alternative the Trustees did not choose). But the law indeed *requires* Central States to explain why it took the action it did (expel only the Local 745 group despite

---

were still trying to gather information from Local 769. Central States' representation that it was "sort of still investigating and looking into some facts" is belied by the minutes of the Trustees' meeting. *Compare id. with* R. 30 at 3.

the fact that Local 745 group was not accused of wrongdoing). *Gallo*, 102 F.3d at 923 (an administrator is required to give the "specific reason" for the decision). Only now, in litigation, does Central States present its reasons: to avoid triggering a complete withdrawal and to minimize the impact on other bargaining units. Opposition 39. Tellingly, however, Central States does not cite to the factual or administrative record to support these *post hoc* justifications. *Id.* This glaring attempt to "shore up" the decision in litigation comes too little and too late. *Emerson*, 202 F.3d at 848 n.7. That Central States provides this additional justification only now—without any attribution to the record—further shows its decision does not pass muster.

### c.     Central States did not follow its own process.

Central States' decision was also arbitrary and capricious because the Trustees violated their own policy regarding terminations. That policy requires the Trustees to consider the effect of termination on the participants or look at the potential benefit cuts that members would receive. Penske Br. 43. Central States concedes this point and argues instead that this policy was not "strict." Opposition 34. But the record contradicts this diminution of the policy. Central States admits that "Trustees examine the interest of the participants and beneficiaries as a whole when considering whether to expel an employer or a bargaining unit." Opposition 35 (citing R. 108-8 at 8). Central States also admits that the "Trustees consider the[] effects of termination [of a group of employees] in making their decision." R.108-8 at 8. There

24

are no exceptions to these statements, and Central States identifies none.[8] Notably, the administrative record contains nothing that reflects, discusses, or examines "the interest of the participants and beneficiaries" either specifically or "as a whole." *See generally*, R. 108-10 at 147–455.

The best Central States can do is point to (1) a chart showing the number of employees in each of Penske's ten bargaining units (along with the CBAs' durations and other data), and (2) the 2016 CBA provision setting out the contribution rates Penske paid to Central States for the Local 745 group. Opposition 35 (*citing* CSPF Appx. 52, 116). Central States believes this information shows the Trustees "knew" that employees would no longer earn future benefit accruals. Opposition 35–36. But a passing reference to the number of participants in the Local 745 group, coupled with the 2016 CBA, are not evidence of "the effect of termination on the participants," much less evidence that the Trustees "examine[d] those issues."[9] To the contrary, there is nothing in the administrative record showing the Trustees "examined" the interests of the participants and beneficiaries "as a whole" or otherwise. For example, perhaps 50% of the Local 745 group was just a month shy of vesting? Or 25% of the group was on the cusp of eligibility for early retirement? Blinded by a myopic focus

---

[8] That this policy is not in the Trust Agreement, as Central States remarks, is of no moment. Central States does not dispute that a plan sponsor can be bound by a policy even if it is not in a trust agreement or mandated by ERISA. *Compare* Penske Br. 44–45, *with* Opposition 34–35.

[9] Everything on which the Trustees relied must be included in the administrative record. *Gallo*, 102 F.3d at 923 ("When challenged in court, the plan administrator . . . cannot augment the administrative record with new facts"). Central States cannot now supplement its defective decision with additional "facts" the Trustees "knew."

on generating $10 million in withdrawal liability, it is easy to see how the Trustees failed to flesh out any of those potential effects of their decision. The Trustees did not follow their procedures, making their decision arbitrary and capricious.

### d.    Central States cannot recast its "questions" as "inconsistencies."

Central States does not contest that a "full and fair review" entails "knowing what evidence the decision-maker relied upon and having a fair opportunity to rebut it." *See Militello v. Central States*, 360 F.3d 681, 690 (7th Cir. 2004). Here, the Trustees had at least four outstanding questions they never posed to Penske. Penske Br. 45–48. Even so, the Trustees held Penske's failure to answer those questions against Penske in their decision. *Id.* Central States justifies the Trustees' mistake, arguing Central States should not be held to the same standard because it has no fiduciary duty to Penske as a contributing employer. Central States cites no law to support this contention. Nor is there any good reason to depart from that standard just because Central States does not owe a fiduciary duty to Penske. In fact, the fiduciary relationship between the parties was not discussed at all in *Militello*, *Quinn v. Blue Cross and Blue Shield*, 161 F.3d 472 (7th Cir. 1998), or *Kunin v. Benefit Tr. Life Ins. Co.*, 910 F.2d 534 (9th Cir. 1990). *See* Penske Br. 45-48. If Central States gets the benefit of the arbitrary and capricious standard of review, there is no reason to depart from the established requirement to give Penske a "fair opportunity to rebut" the evidence on which Central States is relying. *Militello*, 360 F.3d at 690.

26

Central States also recasts the four questions it chose not to ask Penske as "inconsistencies."[10] Yet reframing these four questions as inconsistencies illuminates how Central States' reliance on them is arbitrary and capricious. For example, Central States wanted to know why Penske's experience with the pandemic required shorter contracts when Central States' other contributing employers were not (apparently) requesting shorter contracts. R. 108-14 at 20–21. But how could Penske know the length of the contracts Central States' other contributing employers negotiated during the pandemic? How could Penske have known that its desire for shorter contracts diverged from Central States' experiences with other employers? Without that knowledge, how could Penske have ameliorated that concern? This fact pattern is not an "inconsistency" Penske created, rather a question Central States had. When Penske (understandably) could not anticipate it, the Trustees improperly held the absence of a response against Penske. *Id*.

Likewise, Central States wanted to know why Central States' rejection of the one-year extension agreement meant Penske and Local 745 needed to negotiate non-economic issues. *Id*. Central States recasts this "change in position" as an "inconsistency." Opposition 31. But those two positions are not facially inconsistent.

---

[10] Central States uses an attorney's affidavit to claim that the Trustees did not have "questions," rather the Trustees noted "inconsistencies." CSPF Appx. 315. But this affidavit is dated February 2022, well after the Trustees issued their decision, the administrative record was closed, and Penske identified this problem with the Trustees' decision. R. 108-111 at 6; R. 108-3 at 3; R. 108-10 at 251–52; *see also* R. 44 at 20–22. This Court's review is limited to the administrative record; this *post hoc* elaboration must be discarded. *Gallo*, 102 F.3d at 923.

27

Penske could have done a one-year extension agreement, but needed to negotiate non-economic issues if the agreement was for more than one year. Central States does not know Penske's business. And Central States did not bother to ask.[11] Penske's positions are not inherently inconsistent. Instead, Central States had a question it chose not to ask and then penalized Penske for failing to anticipate it.

Similarly, Central States wondered which party proposed the 2.75-year length for Penske's CBA with Local 769 in Miami. R. 108-14 at 20–21.[12] Central States implicitly concedes it never asked Penske this question. *See* Opposition 31. Rather, the Opposition avoids this issue and pivots to discuss another manufactured "inconsistency": which party— Local 769 or Penske—proposed a two-year contract for the Pompano Beach CBA. Opposition 31. During Central States' "investigation," Penske reported that when the Pompano Beach CBA came up for renegotiation in 2020, Penske sought a short extension so it would come up for renegotiation again in 2021. Appx. 86. But Penske reported Local 769 rejected this request and that Penske and Local 769 eventually settled on a two-year contract. *Id.* Meanwhile, Local 769 told Central States that Penske "was the moving party on proposing a two (2) year contract." *Id.* at 87.

---

[11] Even in discovery, Central States never asked Penske this question. Therefore, the record contains no explanation of Penske's reasoning on this point.

[12] Notably, Local 769 "indicated that Penske did not have any particular duration for the Miami CBA 'that they made a priority.'" R. 108-10 at 21. This factual point shatters the Trustees' argument that Penske intended to line up the CBAs.

Local 769's report to Central States is not, as Central States claims, "contrary to Penske's prior representations." Penske could have (and in fact, did) first propose a one-year extension. When Local 769 rebuffed that, Penske could have then proposed a two-year contract. The Trustees' "inconsistency" is a farse and only shows they did not actually (let alone thoroughly) consider the facts in front of them. And because Central States never raised this issue with Penske, Penske never had the opportunity to clear up the misconception. But Central States still held this alleged "inconsistency" against Penske. That omission is arbitrary and capricious.

Finally, Central States reflected on why Penske did not accept its proposal that if the Local 745 group withdrew in 2022 it would be treated as a 2021 withdrawal. Appx. 88. Central States coupled this failure to accept the settlement proposal with Penske's failure to explicitly deny that it was planning a 2022 coordinated complete withdrawal as of the time of the Trustees' decision and concluded that Penske must have ill intent. CSPF Appx. 63. Yet, once again, Central States never stopped to ask Penske why it was not interested in the settlement proposal.[13]

Ultimately, the administrative record reflects questions the Trustees had for Penske yet opted not to ask. Holding Penske responsible for failing to anticipate the Trustees' questions is arbitrary and capricious. Even if this Court accepts Central

---

[13] In litigation, Penske explained why it did not accept Central States' proposal. R. 113-8 at 7–8. That Central States does not credit these reasons now is immaterial. Opposition 33. What matters is the process: Central States never bothered to ask Penske. That silence is arbitrary and capricious and violates *Militello*.

States' *post hoc* explanation that the Trustees were only recognizing "inconsistencies," a moment's thought reveals no inconsistencies at all.

For each of these reasons, and certainly when examined in combination, the Trustees' decision was arbitrary and capricious.

### 3. The Expulsion Provision violates 29 U.S.C. §1394(b).

#### a. The Expulsion Provision is subject to 29 U.S.C. § 1394(b).

Section 1394(b) requires that "[a]ll plan rules and amendments authorized under [§§ 1381-1405] shall operate and be applied uniformly with respect to each employer . . ." 29 U.S.C. § 1394(b). Sections 1381 through 1405 establish withdrawal liability, define when a partial and complete withdrawal occur, establish methods for calculating and paying withdrawal liability, and create the process for disputing withdrawal liability assessments. 29 U.S.C. §§ 1381–1405.

Central States' argument that ERISA's uniformity requirement does not govern the Expulsion Provision is wrong.[14] This argument ignores that the provisions within §§ 1381–1405 define the events causing a partial or complete withdrawal. Central States asserts that § 1394(b) only applies to certain rules relating to the assessment and calculation of withdrawal liability. Opposition 40. But the language of § 1394(b) has no such limitation. *See* 29 U.S.C. § 1394(b).

---

[14] The district court assumed that § 1394(b) applied to the Expulsion Provision, *see* Appx. 30 n.3, which is why Penske had no need to raise this argument in its opening brief as grounds for reversal. In any event, because Central States raised this issue in its Opposition, Central States' contention that Penske waived this argument is flatly wrong. *Contrast Loja*, 906 F.3d at 685 (holding the appellant may respond to issues first raised in the appellee's brief), *with* Opposition 40 (arguing the opposite).

Central States' Expulsion Provision permits it to reject a CBA, participation agreement, or other agreement and to then expel one or more, but fewer than all, of an employer's bargaining units. This provision is nothing more than a rule permitting Central States to trigger a partial withdrawal. *See* 29 U.S.C. § 1385(b)(2). Central States' apparent predicate for the application of this rule is when such expulsion is necessary to avoid economic harm to Central States. CSPF Appx. 66. But the only rationale for such a rule is to permit Central States to trigger a partial withdrawal to increase the withdrawal liability it can collect. And for that reason, it is a withdrawal liability rule subject to §§ 1381–1405.

Whether an employer partially withdraws from a multiemployer plan is controlled by 29 U.S.C. § 1385 (a section governed by § 1394(b)). Under § 1385, a partial withdrawal occurs when:

> . . . the employer permanently ceases to have an obligation to contribute under one or more but fewer than all collective bargaining agreements under which the employer has been obligated to contribute under the plan. . . .

29 U.S.C. § 1385(b)(2)(A)(i). Central States' Expulsion Provision—allowing for the expulsion of one, but not all, of an employer's bargaining groups—will always, absent extreme measures by the employer, trigger a partial withdrawal. 29 U.S.C. § 1385(b).[15] Whether that partial withdrawal generates a partial withdrawal *liability*

---

[15] An employer could avoid a partial withdrawal only if it closed the operations at the facility for which it is being expelled, and not transfer the work to any other facility. 29 U.S.C. § 1385(b)(2)(A).

is a question determined by the calculations under 29 U.S.C. § 1386.[16] *See* 29 U.S.C. § 1386.

No precedent supports Central States' claim that the Expulsion Provision is not subject to § 1394(b) either. Only one court has addressed whether a multiemployer pension plan's expulsion rule was a rule relating to 29 U.S.C. §§ 1381–1405. *See Caesars Ent. Corp. v. Pension Plan of Nat. Ret. Fund,* No. 15-CV-138, 2015 WL 7254208, at *10 (S.D.N.Y. Nov. 17, 2015) (report and recommendation). There, the court concluded that whether a trust agreement permitted the expulsion of an employer ultimately involved whether a complete withdrawal occurred and, therefore, is related to §§ 1381–1405. Like *Caesars*, Central States' Expulsion Provision ultimately involves whether a partial withdrawal can occur and, therefore, falls under §§ 1381–1405.

Central States contends that § 1394(b) applies only to rules relating to the calculation and payment of withdrawal liability. It cites two cases to support this proposition; neither of them help. Central States points first to *Jos. Schlitz Brewing Co. v. Milwaukee Workers' Pension Plan*, 3 F.3d 994 (7th Cir. 1993), arguing it holds that § 1394 only applies to rules relating to the calculation and payment of

---

[16] Central States seeks to avoid the conclusion that its Expulsion Provision would trigger a partial withdrawal by conflating a partial withdrawal with the amount of the partial withdrawal *liability*. As Central States points out, not all partial withdrawals trigger withdrawal *liability*. Opposition 41. Depending on the fund's financial status and the employer's contribution history, the partial withdrawal liability could be $0. 29 U.S.C. § 1386 (establishing the formula for calculating a partial withdrawal liability amount). But presumably, Central States would only invoke the Expulsion Provision when it would, as here, generate additional income.

withdrawal liability. Opposition 40. But the decision says no such thing. It refers only to § 1394(a) and solely to explain that amendments "changing the method of calculating withdrawal liability" "do[] not apply to an employer that withdrew before [January 31, 1981]." *Jos. Schlitz Brewing Co.*, 3 F.3d at 1001. There is no citation or reference to § 1394(b) in the case, much less that § 1394(b) only applies to the calculation and payment rules.

Central States next cites *Sigmund Cohn Corp. v. District No. 15 Machinists Pension Fund*, 804 F. Supp. 490 (E.D.N.Y. 1992). But that case merely concludes that § 1394(a) prohibits "retroactive application, in the absence of the employers' consent, of plan amendments adopting alternative withdrawal liability calculation methods." *Sigmund Cohn*, 804 F. Supp. at 495. Like *Jos. Schlitz Brewing Co.*, *Sigmund Cohn* neither references § 1394(b) nor addresses its scope.

### b. The Expulsion Provision does not operate uniformly.

Central States does not contest that for some employers the operation of the Expulsion Provision would trigger a partial withdrawal, while for other employers it would trigger a complete withdrawal. *See* Opposition 42–43. Central States argues instead that this difference does not matter since "every employer is different and the statute thus requires different results." Opposition 42. In support, Central States points to its method to calculate an employer's withdrawal liability and that different employers have different amounts of withdrawal liability assigned to them under the same method. *Id.* From this progression, Central States argues the operation of the rule may produce different effects on employers. *Id.* But this argument impermissibly

33

conflates § 1394(b) with § 1391(c). Section 1391(c) involves the "modified presumptive method," a permissible way to calculate withdrawal liability that generates different dollar amounts of liability for different employers. 29 U.S.C. § 1391(c)(2). That the modified presumptive method of calculating withdrawal liability might lead to an assessment of $1 million for one employer and $10 million for another employer is not the result of a "plan rule or amendment" under § 1394(b), but rather the statutory formula and each employer's distinct contribution history. More importantly, a rule operating uniformly does not mean that the rule must result in the same liability. If it did, then every employer withdrawing in the same year would receive the same flat rate withdrawal liability, and neither § 1394(b) nor § 1391 (which sets out the mathematical formulas for calculating withdrawal liability) would have any purpose.

For the first time on appeal, Central States offers another meaning of § 1394(b)'s "operate"—that "operate" is being used "in the mathematical sense." *See generally*, R. 115. That argument is nonsensical because, as explained above, the mathematic operations are addressed in 29 U.S.C. § 1391. Therefore, Congress could not have been referring to mathematics when requiring uniform application and operation under 29 U.S.C. § 1394(b). And nothing in the statute supports Central States' narrow reading. Instead, "the cardinal rule" in statutory construction "is that words used in statutes must be given their ordinary and plain meaning[.]" *Cler* v. *Illinois Educ. Ass'n.*, 423 F.3d 726, 731 (7th Cir. 2005). To that end, the district court's definition of "operate" as "[to] exercise force or influence, produce an effect; to act, work" is appropriate. Appx. 30.

Contrary to Central States' assertion that its partial withdrawal expulsion rule operates uniformly to all employers, common sense dictates that it is impossible for this rule to operate uniformly unless *every* employer contributes to Central States under one CBA, or *every* employer contributes to Central States under more than one CBA. Otherwise, Central States' partial expulsion rule can be applied against employers with multiple CBAs to trigger a partial withdrawal and assess partial withdrawal liability, while under no circumstances could Central States trigger a partial expulsion against an employer with just one CBA. Because Central States has both employers that contribute for one facility under one CBA, and employers that contribute under multiple CBAs, Central States' partial expulsion rule cannot operate uniformly, and therefore, cannot satisfy § 1394(b).

In short, Congress did not intend for multiemployer pension plans to adopt rules that could be used to create withdrawal liability against some employers but under no circumstances could ever be used against other employers. Central States' partial expulsion rule cannot satisfy § 1394(b).

4. **Central States cannot force Penske (or any other employer) to violate the NLRA.**

Ultimately, this case is about Central States' grab for power and money. Central States even takes the position that it can force Penske to violate federal law. More specifically Central States says, "even if an unfair labor practice charge had been filed after the Local 745 group was expelled from the Fund, that would not somehow mean that the Fund was not authorized to expel the group in the first place[.]" Opposition

45. Central States is not above the law. And the cases Central States rely on are either inapposite or no longer good law.

Start with the inapposite cases, *Contemporary Cars, Inc. v. NLRB*, 814 F.3d 859 (7th Cir. 2016) and *NLRB v. Seaport Printing & Ad Specialties*, 589 F.3d 812 (5th Cir. 2009). Those cases discuss the "economic exigencies" doctrine—which relieves an employer from bargaining if "extraordinary events which are an unforeseen occurrence, hav[e] a major economic effect [and] requir[e] the company to take immediate action." *Contemporary Cars*, 814 F.3d at 879 (finding the loss of business in 2008 was neither sudden nor unexpected); and *Seaport Printing*, 589 F.3d at 815 (a hurricane) (citation omitted). Those elements are simply not present here. Central States' attempted expulsion of Penske was in the works for several months. Although the associated withdrawal liability would have a "major economic effect" on Penske, an expulsion of one of 10 bargaining groups itself is simply not akin to the impact of a hurricane on a small business.

Likewise, Central States takes the holding in *Cofire Paving Corp.*, 359 N.L.R.B. 180 (2012) out of context. Opposition 44. *Cofire* stands for the proposition that "when an employer is faced with the discontinuation of existing benefits o*wing to circumstances beyond the employer's control,*" if the employer bargains over the necessary changes, it does not necessarily violate Section 8(a). *Id.* at 184 (emphasis added). But here, the Union would argue that the expulsion was not a "circumstance[] beyond [Penske's] control" because Penske could have (but chose not to) avail itself of Central States' "settlement offer." *Id. Cofire Paving* is also not good law. *See Midwest*

36

*Operating Eng'rs v. Dredge*, 147 F. Supp. 3d 724, 745 n.11 (N.D. Ill. 2015) (St. Eve., J.) (observing same), *aff'd sub nom. Midwest Operating Eng'rs Welfare Fund v. Cleveland Quarry*, 844 F.3d 627 (7th Cir. 2016). After the decision in *Cofire Paving*, the Supreme Court found that the President invalidly appointed three individuals to the NLRB, including one board member who decided *Cofire Paving*. *NLRB v. Noel Canning*, 573 F.3d 490 (2014).

Finally, *StaffCo of Brooklyn v. NLRB*, 888 F.3d 1297 (D.C. Cir. 2018), does, in fact, support Penske's position. In *Staffco* there was no dispute that "by failing to make pension contributions, [the employer] failed to meet its status quo obligations." *Id.* at 1302. But the Court determined there was not enough factual support in the record to determine that the pension plan would have rejected any *status quo* payments made after expiration of the CBA. *Id.* at 1305. Here, Central States does not deny that it wanted to (and tried to) prevent Penske from maintaining the *status quo*. Central States cannot force Penske to violate the NLRA's requirement to maintain the *status quo*.

B.     **The District Court Correctly Dismissed Central States' Claim For Declaratory Judgment.**

Count II of Central States' counterclaim sought a declaratory judgment determining that Penske's obligation to contribute to the Fund on behalf of the Local 745 group ended on December 25, 2021. R. 56 at 5. In other words, Central States asked the district court to determine the date that Penske's Local 745 group withdrew from the Fund and incurred withdrawal liability under ERISA. The district court correctly dismissed Count II for failing to state a claim. Appx. 14. More specifically,

the district court dismissed this claim because it improperly sought to avoid ERISA's mandatory arbitration requirement. *Id.* Even if considered on the merits, Penske's obligation to contribute to Central States on behalf of the Local 745 group ended on May 6, 2022, not December 25, 2021.

### 1. Central States' Count II is subject to mandatory arbitration.

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Kaminski v. Elite Staffing*, 23 F.4th 774, 776 (7th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim seeking to avoid arbitration requirements fails to state a claim. *See e.g.*, *Cont'l Cas. Co. v. Am. Nat'l Inc.*, 417 F.3d 727, 733 (7th Cir. 2005) (dismissal under Rule 12 is appropriate if arbitration is required).

Identifying the cessation date of an employer's obligation to contribute to a multiemployer pension fund is a fact question subject to mandatory arbitration under 29 U.S.C. § 1401(a). Section 1401(a) says:

> Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration.

29 U.S.C. § 1401(a); *Robbins v. Admiral Merch. Motor Freight*, 846 F.2d 1054, 1057 (7th Cir.1988) ("Very simply, § 1401(a) requires arbitration of any dispute regarding a determination made under §§ 1381-1399.").

Under ERISA, a withdrawal occurs when an employer "permanently ceases to have an obligation to contribute under the plan" or there is a "cessation of the

38

employer's contribution obligation." 29 U.S.C. §§ 1383(a), 1385(a)(2). Here, determining "the date on which Penske's obligations to contribute on behalf of Local 745 ceased" necessarily determines the date of withdrawal. So, when the cessation of an employer's contribution obligation occurred is included within the scope of § 1401(a)'s mandatory arbitration requirement. 29 U.S.C. §§ 1383(a), 1385(a)(2), 1401(a).

For over three decades, the Seventh Circuit has held that the determination of the date of withdrawal must be arbitrated first. *Central States v. Bomar Nat'l*, 253 F.3d 1011, 1014 (7th Cir. 2001) ("The merits of the dispute regarding withdrawal liability, including the date of its incurrence, must be referred to arbitration."); *Robbins v. Lady Baltimore Foods*, 868 F.2d 258, 264 (7th Cir. 1989) (same); *Robbins v. Admiral Merchants Motor Freight*, 846 F.2d 1054, 1057 (7th Cir. 1988) (same). And in *Bomar*, 7th Cir. App. Case No. 22-1549, Central States argued precisely the same. Dkt. 10-6 at pp. 56–57 ("[T]he date of withdrawal [is] a question expressly reserved for the arbitrator to decide" and "[t]he District Court correctly determined that for it to decide on the correct date of withdrawal would be to invade the role of the arbitrator[.]").

Even in this matter, Central States recognized that the date of withdrawal would be subject to mandatory arbitration. R. 31 at 19:21-20:12 (acknowledging the question regarding a withdrawal liability demand date "would be a separate matter, and that matter would proceed to arbitration"). Central States cannot now claim that this law has changed, because it has not.

39

Faced with these dispositive authorities, Central States does two things. First, it argues that Count II does not seek a "determination of the date of withdrawal" but, instead, a "determination of the date on which Penske's obligations to contribute on behalf of Local 745 ceased." *See* Opposition 46–47. Because Central States has not yet issued a withdrawal liability assessment, Central States argues the district court's determination of when Penske's obligation to contribute on Local 745's behalf ended is outside the ambit of § 1401(a)'s arbitration requirement. Opposition 47. Second, Central States argues that this Court has jurisdiction over contribution issues. Opposition 46. Neither argument prevails. Like the district court, this Court should be "unpersuaded by Central States's careful wordsmithing" to avoid the arbitration requirement. Appx. 13.

### a. Central States' failure to issue a withdrawal liability assessment does not save its claim.

"[T]he question of an employer's withdrawal date from a pension fund is one which is subject to mandatory arbitration." *Robbins*, 868 F.2d at 264. By asking this Court to decide the "the date on which Penske's obligations to contribute on behalf of Local 745 ceased," Central States really seeks a back-door determination of Penske's withdrawal date. As the district court recognized, "[i]n effect, Central States asks this Court to make the withdrawal liability determination for it, and then, presumably, the consequences of that decision can be taken up in arbitration." Appx. 14. But "[n]o amount of artful pleading should be able to recharacterize the relief [Central States] truly seek[s]." Appx. 13.

40

Here, Central States made a choice not to issue any withdrawal liability assessment against Penske (the issuance of which would allow Penske to demand arbitration if it disagreed with the assessment). This failure to issue the assessment, Central States contends, means that this Court can assume jurisdiction over this factual question, which is otherwise unquestionably within the scope of 29 U.S.C. §§ 1381–1399. In other words, Central States uses procedural gamesmanship to avoid the same black letter law they relied upon for decades. There simply is no subject matter jurisdiction over Local 745 group's withdrawal date unless and until an arbitrator rules on this issue first. Section 1401(a) establishes that is a question for an arbitrator, and Central States may not use a declaratory judgment to prematurely circumvent ERISA's arbitrate-first requirement.[17]

> **b.    Determining the date of withdrawal is subject to mandatory arbitration even if appellate jurisdiction exists over unrelated contribution issues.**

In arguing the district court could exercise jurisdiction under the NLRA—not ERISA—Central States seeks to avoid this Court's well-established precedent regarding mandatory arbitration on withdrawal dates. Opposition 65–66. Central States contends that ERISA's arbitration requirement is nullified if this Court

---

[17] *See e.g.*, *Simon v. Pfizer Inc.*, 398 F.3d 765, 776 (6th Cir. 2005) (a party cannot avoid a contractual arbitration clause "simply by renaming its claims so that they appear facially outside the scope of the arbitration agreement"); *Catholic Health Partners v. Carelogistics, LLC*, 973 F.Supp.2d 787 (N.D. Ohio 2013) (misuse of the Declaratory Judgment Act to gain a procedural advantage, such as preempting arbitration, is grounds for dismissal).

interprets the labor contract under 29 U.S.C. § 185(a). But because every contribution issue has withdrawal liability implications, that is not, nor can it be, true.

Regardless of whether a federal court has parallel jurisdiction over ancillary issues (such as alleged delinquent contributions), disputes about withdrawal liability must go to arbitration. *See, e.g., Central States v. Rail Terminal Services*, 2019 WL 2326002, \*2 (N.D. Ill. May 31, 2019) (dismissing Central States' claims for delinquent contributions while the parties arbitrated the date Rail Terminal Services withdrew from Central States).[18]

In *Rail Terminal*, the court recognized that although Central States' claim was styled as a claim for delinquent contributions, "when undertaking more than a cursory review of the pleadings it becomes evident that the dispute is centered on Rail Terminal's withdrawal liability." *Id.* at \*9. The court in *Rail Terminal* recognized such "ruling . . . would make it inescapable that the Court would have to determine whether and when Rail Terminal withdrew from [Central States]." *Id.* at \*10 (citing *Central States v. Metcalf Moving & Storage Co.*, 1996 WL 341405, at \*3 (N.D. Ill. June 18, 1996) (observing the case presented contribution and withdrawal questions, which had no practical difference and "[b]oth revolve[d] around a single question")). "Even the seemingly innocent threshold proposition of determining whether [an employer] withdrew from the Fund[] would be improper." *Rail*

---

[18] Penske does not argue that a court can never exercise jurisdiction over the Fund's apparent questions about whether or not contributions are owed to the Fund from December 25, 2021 onward. *Cf.* Opposition 65–66 (arguing Central States is entitled to the Court's assistance "to determine what contributions are owed to" the Fund). Penske only argues that an arbitrator must first determine the date of Penske's withdrawal.

*Terminal*, 2019 WL 2326002 at \*3 (citing *Tsareff v. ManWeb Servs.*, 794 F.3d 841, 849-50 (7th Cir. 2015) (endorsing the proposition that the question of whether an employer withdrew is reserved solely for an arbitrator)).

Central States believes these holdings do not apply because, in each case, a withdrawal liability demand had already been issued. Opposition 48. But Central States cannot delay issuing a withdrawal liability demand and then use a declaratory judgment proceeding to dodge ERISA's arbitrate-first requirement. *Supra* at pp. 38–40.

Congress recognized that nuanced determinations regarding withdrawal liability are best decided by an arbitrator with extensive experience under ERISA. As observed in *Combs v. Leishman*, "Congress established the arbitration requirement to enable disputants to take advantage of an arbitrator's superior expertise and to encourage non-judicial resolution of disputed matters relating to withdrawal liability." 691 F. Supp. 424 (D.D.C.1988); *see also Trustees of Chicago Truck Drivers Pension Fund v. Chicago Kansas City Freight Line, Inc.,* 694 F. Supp. 469, 474 (N.D. Ill. 1988) ("[T]his case 'bristles' with issues within the special knowledge and expertise of an arbitrator skilled in the areas of labor and pension law."). The question, then, "of when an employer has [] withdrawn . . . so as to trigger liability" is "precisely the kind of dispute contemplated by Congress in enacting the [arbitration requirement]." *Id*. To conclude otherwise . . . is entirely inconsistent with Congress' "arbitrate first' policy." *Id*.

Central States' only way to circumnavigate mandatory arbitration is to argue that the *Rail Terminal* court erred, and that court should have followed a case from four decades ago, *Lancaster v. Norfolk & W. Ry. Co.*, 773 F.2d 807, 816–17 (7th Cir. 1985). In *Lancaster*, a plaintiff injured at work was permitted to pursue a claim under the Federal Employers' Liability Act ("FELA") instead of the Railway Labor Act, which requires disputes under CBAs in the railroad industry to be arbitrated. Central States argues *Lancaster* means it can avoid ERISA's mandatory arbitration provision here. *Id.* at 812. But *Lancaster* readily drew a distinction between the two federal statutes: "FELA does not reach torts which work their harm through nonphysical means; the only torts it provides a remedy for happen not to come within the scope of the Railway Labor Act." *Id.* at 815. This Court reasoned that because the plaintiff's claims were physical in nature and did not implicate a CBA, he could proceed under FELA in court rather than go to mandatory arbitration under the Railway Act since "[a]rbitrators have no particular competence to determine causality and assess damages in cases of serious personal injury." *Id.* at 816–17. *Lancaster* recognizes that when Congress intends for arbitrators with specialized knowledge to adjudicate disputes, Congressional intent prevails. *Id.*

Here, Congress intended for arbitrators with specialized knowledge to determine the date of an employer's withdrawal. *Supra* p. 43. Instead, Central States wants this Court to rule that ERISA does not apply to *any* suit involving the interpretation of a CBA because it could also implicate the NLRA. Opposition 46–47. That cannot be.

44

Otherwise, ERISA is rendered meaningless and its mandatory arbitration provisions would be superfluous.[19]

The district court correctly dismissed Central States' request for declaratory relief. Permitting Central States' scheme would curb arbitration for many withdrawal liability disputes. If Central States prevails, then Central States could use this reasoning to seek a declaratory judgment under the NLRA (and thereby bypass mandatory arbitration) for literally any dispute over an employer's contribution history that impacts a withdrawal liability assessment (*e.g.*, for which employees were contributions due?; when did contributions start?; when did contributions end?; how much was the "highest contribution rate" under the collective bargaining agreement?, etc.). That result cannot be true. Otherwise, Penske (and any other employer participating in a multiemployer pension fund) would lose statutory rights intended by Congress, including the right to have an arbitrator determine the cessation date of Penske's obligation to contribute for the Local 745 group.

---

[19]Central States takes Penske's counsel's quote that jurisdiction under the LMRA exists out of context. Opposition 47. In fact, Penske's counsel was speaking (on December 23, 2021) about Penske's affirmative claim, before Central States even filed its counterclaim in January 2022 (R. 33). *Penske's claim* (that any attempted expulsion is beyond the Trustees' authority) falls under LMRA. But deciding Penske's claim does not require determining *Central States' claim* (the date of withdrawal), which is subject to mandatory arbitration. *See supra* p. 43.

> **2. If this Court addresses Central States' Count II on the merits, Penske's obligation to contribute ceased on May 6, 2022.**

If this Court elects to address Central States' Count II on the merits, evidence shows Penske's obligation to contribute to Central States on behalf of the Local 745 group ceased on May 6, 2022, not on December 25, 2021.[20]

On December 14, 2021, the Trustees decided to expel Penske's Local 745 group effective December 25, 2021. Appx. 91. Ten days later, the district court restrained Central States from "taking any action to create a partial withdrawal under 29 U.S.C. § 1385 for Penske, including, but not limited to, ejecting Penske's Local 745 group from the Fund." R. 25

On March 17, 2022, Penske made the decision to withdraw each of its remaining units from Central States. R. 108-3 at 3–4. Meanwhile, on April 6, 2022, the district court vacated the December 2021 TRO. R. 72.

The day after the district court's April 6, 2022 decision, Central States reversed all post-December 25, 2021, pension credits for the Local 745 group. CSPF Appx. 319. But it did not tell Penske that the Local 745 group was expelled (effective December 25, 2021, April 6, 2022, or any other date). R. 108-3 at 4. Instead, Central States continued to accept Penske's contributions on behalf of Penske's Local 745 group. *Id.* After the district court's April 2022 decision, Penske still made its monthly contribution to Central States on behalf of its Local 745 group. *Id*. Central States

---

[20] Of course, if this Court finds that the Trustees were not authorized to expel the Local 745 Group and/or their decision was arbitrary and capricious, the date the Local 745 group withdrew from Central States must be May 6, 2022.

never refunded this money or credited it against Penske's obligations to contribute on behalf of its other bargaining groups. *Id.* at 5. Instead, Central States sent invoices for those other bargaining groups, alleging Penske was behind in its payments. *Id.* Those invoices reflected no credit for the contributions Penske made on behalf of its Local 745 group in 2022. *Id.*

On April 30, 2022, Penske and Local 745 finalized their new CBA. *Id.* The new agreement, which was effective as of March 1, 2022 does not require contributions to Central States. R. 108-22 at 2, 29. Penske notified Central States of the new CBA on May 2, 2022. R. 108-3 at 5. In its letter, Penske also asked Central States to return all contributions Penske made between March 1, 2022, and May 2, 2022, for the Local 745 group. R. 108-23 at 2. Central States received the notice on May 6, 2022. R. 108-3 at 5. Thus, Penske's obligation to contribute to Central States on behalf of its Local 745 group ended on May 6, 2022. CSPF Appx. 12.

Eight months later, in January 2023, Central States first acknowledged Penske's request for a refund and admitted that it had not refunded the contributions. R.112-2 at 2-4. At that point, Central States asked Penske to submit any additional information it would like for the Trustees to adjudicate the refund request, and told Penske it would consider this issue during the Pension Fund's March 2023 meeting. *See id.* But, from Central States' perspective, that "investigation" or "decision making process" would not be necessary if Central States believed it had actually effectuated the expulsion of Penske's Local 745 group. If Central States *had* expelled Penske's Local 745 group effective December 25, 2021 (or April 6, 2022, or some other date),

47

there would be no question that Penske would be entitled to a refund as Central States should have rejected those contributions outright. There would be no need to ask Penske for additional information or to have the Trustees render a decision as to the fate of the contributions.

The Trustees still have not refunded Penske any money nor have they informed Penske of its decision about same. Nevertheless, Central States claims it is entitled to a declaratory judgment that the Local 745 group was expelled effective December 25, 2021. Opposition 50. Central States cannot have it both ways. Either the Trustees made the decision and tried to retroactively expel the Local 745 group, or they did not (in which case, Penske would be entitled to a refund). That Central States has not refunded the contributions is evidence no expulsion occurred.

ERISA only permits Central States to refund contributions if they were made "by a mistake of fact of law." 29 U.S.C. § 1103(c)(2). Central States exploits this rule, arguing that because Penske's "ACH transfer . . . appear[ed] intentional" Penske did not make a mistake so Central States can keep the money. R. 121 at 12–13. Central States even argues it may retain contributions if it retroactively expelled an employer, potentially years (and millions of dollars of contributions) later. *Id.*; Opposition 50. If true, Central States not only gets its cake and eats it too, it gets the keys to the whole bakery.

Here, Central States never effectuated the expulsion of the Local 745 group. When the district court vacated the TRO, Central States could have told Penske that the expulsion of Penske's Local 745 group was effective and refunded the previously-paid

48

contributions (or at least credited them to Penske's other accounts). But it did not. Instead, Central States continued to accept Penske's contributions for its Local 745 group until *Penske* notified Central States that it no longer had an obligation to contribute on behalf of the Local 745 group and stopped contributing. Thus, if this Court finds that it has jurisdiction to determine the date Penske's Local 745 group withdrew from Central States—and it should not—the correct answer is May 6, 2022, not December 25, 2021.

### 3. The district court should not be forced to retain jurisdiction.

Finally, Central States argues in the alternative that this Court "should remand to the District Court with instructions to retain jurisdiction." Opposition 66. In essence, Central States wants the district court to retain jurisdiction so that if this Court decides the Trustees' expulsion decision was lawful (which it was not), and an arbitrator later determines Penske's obligation to contribute for the Local 745 group ceased in 2022, Central States could still be awarded damages from the district court. *Id.* That claim, however, is an impermissible retroactive demand for a bond.

By way of background, in the district court's April 2022, decision, the district court denied Central States' request for a $150,000,000 bond. The court explained, "[t]hough Central States has suggested that it would suffer harm as a result of a preliminary injunction being entered, and accordingly has requested a bond of $150,000,000, Central States has not sufficiently explained how it would be harmed nor has it demonstrated how it calculated such a large bond amount." R. 72 at p. 33.

Central States' appeal, however, is limited to "the District Court's dismissal of Count II of the Fund's Amended Counterclaim." Case No. 25-1872, Dkt. 1. That appeal does not encompass the district court's decision on the preliminary injunction —a decision that included a ruling not to require a bond. This is a critical omission by Central States, particularly where Central States asserts that the district court can reinterpret its own prior decision to not require a bond. Although true that a federal court has jurisdiction to interpret its own prior orders, it cannot do so without jurisdiction in the first place. And a mere possibility of consequences is insufficient to create jurisdiction. *See, e.g., Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (standing requires an injury in fact; no standing exists for "conjectural or hypothetical" injuries). There is no live case or controversy over which the district court could maintain jurisdiction. Instead, Central States asks this Court to order the district court to retain jurisdiction until some undefined point in the future: (1) if/when Central States presumably issues a withdrawal liability assessment; (2) if/when Penske disputes it; (3) if/when an arbitrator finds the Local 745 group withdrew from Central States in 2022 because of the operation of the TRO; and (4) if/when that is upheld on appeal. Only if/when *each* of these things happen, does Central States want the district court to exercise jurisdiction to "administer complete relief." Opposition 51. These are speculative harms, the existence of which are highly dependent on facts that are not yet developed. Furthermore, because any arbitrator's decision could be appealed to federal court, the district court does not need to retain jurisdiction now. *See* 29 U.S.C. § 1401(b)(2).

50

Central States points to *Buttron v. Sheahan,* Civ. A. No. 00-4551, 2001 WL 111028, at \*3 (N.D. Ill. Feb. 2, 2001) and the cases it cites, to argue the district court can "retain jurisdiction to administer complete relief and do full justice in the case." But those cases all have much narrower holdings: A court of equity may *simultaneously* award both legal and equitable damages. *Buttron* does not support Central States' requested relief.

The district court decided the claims in front of it. Any future claims must be addressed through mandatory arbitration. *Niro v. Fearn Intern.*, 827 F.2d 173, 176 (7th Cir. 1987) ("once it is determined that the underlying dispute concerns a subject matter covered by arbitration provisions, the court's only role is to order arbitration").

## VII.   CONCLUSION

This Court has multiple clean paths to reverse the district court's decision. This Court can find:

- The Trust Agreement does not permit a single unit expulsion without the rejection of a CBA, participation agreement, or other agreement and either:

  o  the plain text of the Trustees' decision did not reject a CBA, participation agreement, or other agreement; or

  o  the Trustees could not implicitly reject the 2016 CBA because the 2016 CBA had expired; and the Trustees could not implicitly reject the Participation Agreement because by its terms, the Participation Agreement required the expulsion of all of Penske, as an Employer.

or

- The Trustees' decision was arbitrary and capricious for any (or all) of the reasons explained above;

or

51

- The Expulsion Provision violates 29 U.S.C. § 1394(b) because it does not "operate and apply" uniformly;

or

- The Trustees' expulsion of Local 745 group is unlawful because it forces Penske to violate the NLRA.

If none of those arguments convince the Court that reversal is warranted (and each should), this Court still should reverse the district court's decision because—as Central States implicitly conceded—the district court erred by refusing to examine the Expulsion Provision *de novo* before giving deference to the Trustees' interpretation of unambiguous provisions.

Therefore, Penske requests this Court to reverse the district court's decision and remand with instructions to enter judgment in Penske's favor on Penske's claim against Central States and on Count I of Central States' counterclaim for attorneys' fees.

The district court properly dismissed Count II of Central States' counterclaim and that part of the district court's decision should be affirmed.

August 20, 2025

Respectfully submitted,

*/s/ Sarah Bryan Fask*

Sarah Bryan Fask
LITTLER MENDELSON, P.C.
1601 Cherry Street, Suite 1400
Philadelphia, PA 19102
(267) 402-3070
sfask@littler.com


Lawerence D. Levien
LITTLER MENDELSON, P.C.
815 Connecticut Avenue NW
Suite 400
Washington, DC 20006
(202) 772-2535
llevien@littler.com

*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7) and Circuit Rule 32(c) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,996 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) and the typeface requirements of Circuit Rule 32(b) because this document has been prepared in a proportionally spaced typeface using Microsoft Office Word 16 in Century Schoolbook font that is sized 12 points in the body of the brief and 11 points in the footnotes.

August 20, 2025

*/s/ Sarah Bryan Fask*
Sarah Bryan Fask

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 20, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

August 20, 2025

*/s/ Sarah Bryan Fask*
Sarah Bryan Fask