Nos. 25-1738 & 25-1872

---

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

PENSKE TRUCK LEASING CO., L.P.,
*Plaintiff-Appellant/Counter-Defendant-Cross-Appellee,*

v.

CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS
PENSION PLAN, AND THE TRUSTEES OF THE CENTRAL
STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION
FUND,
*Defendants-Appellees/Counter-Plaintiffs-Cross-Appellants.*

---

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division
Case No. 1:21-cv-5518—**Andrea R. Wood**, *District Judge*

---

## CENTRAL STATES' CROSS-APPEAL REPLY BRIEF

---

Daniel E. Sullivan
CENTRAL STATES FUNDS
8647 W. Higgins Road
Chicago, Illinois 60631
847-582-5078
Dsulliva@centralstatesfunds.org
*ATTORNEY FOR CENTRAL STATES,
SOUTHEAST AND SOUTHWEST
AREAS PENSION FUND AND ITS
TRUSTEES*

---

## ORAL ARGUMENT REQUESTED

---

**TABLE OF CONTENTS**

Table of Contents ....................................................................................................i

Table of Authorities ..............................................................................................ii

Argument ............................................................................................................... 1

    I.   The District Court Had Jurisdiction over the Fund's Counterclaim. ............... 2

    II.  The Present Dispute Is Outside the Scope of 29 U.S.C. § 1401........................ 3

       A.  Penske Ignores the Plain Text of 29 U.S.C. § 1401(a). ................................ 3

       B.  Litigating Contributions Issues Is Proper Under the LMRA, ERISA, and MPPAA. ....................................................................................................... 7

    III. The Decision to Expel the Local 745 Group Is Effective................................. 11

       A.  The Court Should Hold that the Expulsion Decision Is Effective December 25, 2021 Notwithstanding the TRO. ........................................................... 11

       B.  Penske's Arguments Regarding the "Acceptance" or "Refund" of Certain Payments Are Irrelevant and Incorrect........................................................ 13

    IV.  Unless the Court Finds that the Local 745 Group Was Expelled Effective in 2021, the District Court Should Retain Jurisdiction. ...................................... 15

Conclusion ............................................................................................................ 20

Federal Rule of Appellate Procedure 32(g) Certificate of Compliance ...................... 21

Certificate of Service............................................................................................. 22

FV: 472836857 / 25000010 / 9/10/2025

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Balt. & O.R. Co. v. United States,*
279 U.S. 781 (1929).........................................................................................17

*BankDirect Cap. Fin., LLC v. Cap. Premium Fin., Inc.,*
912 F.3d 1054 (7th Cir. 2019) .............................................................. 12, 16, 17

*Buttron v. Sheahan,*
2001 WL 111028 (N.D. Ill. Feb. 2, 2001) ...........................................................17

*Catholic Health Partners v. CareLogistics, LLC,*
973 F. Supp. 2d 787 (N.D. Ohio 2013) ................................................................9

*Cent. States, Se. & Sw. Areas Pension Fund v. Bomar Nat'l., Inc.,*
253 F.3d 1011 (7th Cir. 2001) .............................................................................4

*Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.,*
472 U.S. 559 (1985).........................................................................................10

*Cent. States, Se. & Sw. Areas Pension Fund v. Gerber Truck Serv., Inc.,*
870 F.2d 1148 (7th Cir. 1989) (en banc) .............................................................5

*Cent. States, Se. & Sw. Areas Pension Fund v. Rail Terminal Services LLC,*
2019 WL 2326002 (N.D. Ill. May 31, 2019) .....................................................4, 9

*Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. El Paso Co.,*
525 F.3d 591 (7th Cir. 2008) ..............................................................................7

*Colo. River Water Conservation Dist. v. United States,*
424 U.S. 800 (1976).........................................................................................2

*DDI Seamless Cylinder Int'l, Inc. v. Gen. Fire Extinguisher Corp.,*
14 F.3d 1163 (7th Cir. 1994) .............................................................................13

*Hewitt v. United States,*
145 S. Ct. 2165 (2025).....................................................................................12

*Jass v. Prudential Health Care Plan, Inc.,*
88 F.3d 1482 (7th Cir. 1996) ..............................................................................9

*Lancaster v. Norfolk & Western Railway Co.,*
773 F.2d 807 (7th Cir. 1985) ........................................................................10, 11

*Leu v. Norfolk & W. Ry. Co.*,
  820 F.2d 825 (7th Cir. 1987) ......................................................................... 9

*MainStreet Org. of Realtors v. Calumet City*,
  505 F.3d 742 (7th Cir. 2007) ....................................................................... 18

*Medici v. City of Chi.*,
  856 F.3d 530 (7th Cir. 2017) ....................................................................... 12

*Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co.*,
  513 U.S. 414 (1995)........................................................................................ 6

*Mitchell v. Wall*,
  808 F.3d 1174 (7th Cir. 2015) ..................................................................... 16

*Robbins v. Admiral Merchants Motor Freight, Inc.*,
  846 F.2d 1054 (7th Cir. 1988) ....................................................................... 4

*Robbins v. Lady Balt. Foods, Inc.*,
  868 F.2d 258 (7th Cir. 1989) ......................................................................... 4

*Schneider Moving & Storage Co. v. Robbins*,
  466 U.S. 364 (1984)........................................................................................ 2

*Simon v. Pfizer Inc.*,
  398 F.3d 765 (6th Cir. 2005) ......................................................................... 9

*Travelers Indem. Co. v. Bailey*,
  557 U.S. 137 (2009)................................................................................... 2, 19

*United States v. Munsingwear, Inc.*,
  340 U.S. 36 (1950)........................................................................................ 12

*Vera v. Banco Bilbao Vizcaya Argentaria, S.A.*,
  946 F.3d 120 (2d Cir. 2019) ........................................................................ 17

**Statutes**

29 U.S.C. § 1132 .................................................................................... 1, 5, 7

29 U.S.C. § 1391 ....................................................................................... 5, 6

29 U.S.C. § 1399 ....................................................................................... 5, 6

29 U.S.C. § 1103 .......................................................................................... 14

29 U.S.C. § 1132 ..................................................................................... 7, 10

29 U.S.C. § 1401 ...................................................................................... passim

29 U.S.C. § 185(a) ..................................................................................... 2, 3, 9

FV: 472836857 / 25000010 / 9/10/2025

**ARGUMENT**

As explained in the Fund's first brief,[1] the District Court should have entered summary judgment in the Fund's favor on its counterclaim instead of dismissing it. The provision on which the District Court relied, 29 U.S.C. § 1401(a), makes clear that the arbitration requirement of MPPAA is limited to "determinations made" pursuant to 29 U.S.C. §§ 1381 through 1399, and there has been no such determination made here. Penske does not dispute the Fund's application of this language of 29 U.S.C. § 1401(a) in any meaningful way, but instead asserts a transparently self-serving theory of jurisdiction: in Penske's telling, the District Court and this Court have jurisdiction to find that the Trustees' decision was invalid, but somehow lack jurisdiction to uphold that decision. (Penske Reply, Dkt. No. 20, at 2–3.) But Penske's argument—that contributions issues with an impact on withdrawal liability must be arbitrated even where there has been no determination made under 29 U.S.C. § 1401(a)—is not only inconsistent with Penske's own claims, it is also in conflict with ERISA's conferral of jurisdiction to federal courts over contributions lawsuits. Indeed, Penske's theory would eviscerate 29 U.S.C. §§ 1132 and 1145 (which provide multiemployer funds with a federal court forum for delinquent contribution actions) because, as Penske points out, nearly every contributions case has withdrawal liability implications. (Penske Reply, Dkt. No. 28, at 42.) Instead of extending 29 U.S.C. § 1401(a) beyond its

---

[1] Terms not defined herein are intended to have the meaning ascribed to them in the Fund's first brief (Dkt. No. 20).

language, the Court should hold that there is federal court jurisdiction to decide an issue that the parties have litigated in federal court for nearly 4 years: was the Local 745 Group expelled in 2021?

## I. The District Court Had Jurisdiction over the Fund's Counterclaim.

The District Court had jurisdiction over the Fund's counterclaim for at least two reasons. (*See* Fund's Initial Brief, Dkt. No. 20, at 46–47.) First, the District Court had jurisdiction under 29 U.S.C. § 185(a), as the counterclaim presented an issue relating to the interpretation of the Fund's Trust Agreement and of the Trustees' actions thereunder. *Schneider Moving & Storage Co. v. Robbins*, 466 U.S. 364, 366 n.2 (1984) ("[29 U.S.C. § 185(a)] provides a federal forum for suits to enforce labor contracts, including pension and welfare fund agreements.") Second, and as further discussed in Part III below, the Fund's request for declaratory judgment in its counterclaim required interpretation of the District Court's prior TRO and its order vacating the TRO, and a district court "plainly ha[s] jurisdiction to interpret . . . its own prior orders." *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009). By dismissing the Fund's counterclaim, the District Court failed to fulfill the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).

Penske does not contest either basis for jurisdiction. (*See also* Penske Reply, Dkt. No. 28, at 2-3 (arguing for jurisdiction over "whether Central States' decision to [expel] was arbitrary and capricious").) Instead, Penske mischaracterizes the

Fund as taking the position that 29 U.S.C. § 1401 categorically cannot apply when 29 U.S.C. § 185(a) applies. (Penske Reply, Dkt. No. 28, at 41–42.) But, as explained below, the Fund's position is simply that, under 29 U.S.C. § 1401(a)'s plain language, there is no arbitration requirement unless and until a determination is made under 29 U.S.C. §§ 1381–1399.

## II.    The Present Dispute Is Outside the Scope of 29 U.S.C. § 1401.

### A.  Penske Ignores the Plain Text of 29 U.S.C. § 1401(a).

The text of 29 U.S.C. § 1401 by its own terms applies only to "dispute[s] . . . concerning a determination made under sections 1381 through 1399 of [29 U.S.C.]," which sections set forth various requirements and rules relating to calculating withdrawal liability assessments. Here, since there has not been any withdrawal liability assessment issued, there has been no "determination made" under those sections and, as a result, the present dispute is outside the ambit of 29 U.S.C. § 1401. After the Trustees made their decision on December 14, 2021, Penske made precisely this point when questioned as to the District Court's jurisdiction:

> So right now, there is no determination that's been made. Determinations are those that are required to be arbitrated under Section 1451 -- I'm sorry -- under Section 1401 of ERISA. If you found in favor of the fund and if they expelled us, it would still be our position that this is a case under LMRA, the Labor Management Relations Act, that the trust agreement, which is a contract for LMRA purposes, was being breached in a way that was impacting negotiations. So it would still -- I believe we would still have jurisdiction in this case under these circumstances.

(December 23, 2021 Tr., CSPF Sep. Appx. at 0272, at 15:13–19.) Thus, Penske's counsel took two unambiguous (and correct) positions: first, that the Trustees' December 14, 2021 decision to expel the Local 745 Group was not a "determination"

for purposes of 29 U.S.C. § 1401; and, second, that 29 U.S.C. § 1401 does not require arbitration until such a determination has been made. Although Penske proffers the argument that its December 23, 2021 statement is being cited "out of context," it fails to provide any meaningful context that the Fund omitted. (Penske Reply, Dkt. No. 28, at 45 n.19.)

In any event, Penske does not explain why the Court should ignore 29 U.S.C. § 1401(a)'s statement that arbitration is only appropriate for disputes regarding a "determination made" under 29 U.S.C. §§ 1381–1399. Tellingly, each case cited by Penske for this point (Penske Reply, Dkt. No. 28, at 39) involved a situation where a fund had already issued a notice and demand for payment of withdrawal liability and thus had already made its withdrawal liability "determinations" within the meaning of 29 U.S.C. § 1401. *Cent. States, Se. & Sw. Areas Pension Fund v. Rail Terminal Servs. LLC*, No. 18-cv-2372, 2019 WL 2326002, at *2 (N.D. Ill. May 31, 2019); *Cent. States, Se. & Sw. Areas Pension Fund v. Bomar Nat'l, Inc.*, 253 F.3d 1011, 1014 (7th Cir. 2001); *Robbins v. Lady Balt. Foods, Inc.*, 868 F.2d 258, 259 (7th Cir. 1989); *Robbins v. Admiral Merchants Motor Freight, Inc.*, 846 F.2d 1054, 1055 (7th Cir. 1988). Accordingly, both the text of 29 U.S.C. § 1401 and the case law make clear that the arbitration requirement only applies where there has been a determination made relating to withdrawal liability, and no such determination has been made here. (December 23, 2021 Tr., CSPF Sep. Appx. at 0272, at 15:13–19 (Penske's counsel stating, "there is no determination that's been made.").)

Indeed, Penske never proposes an alternative rule for when 29 U.S.C. § 1401 comes into play beyond the vague suggestion that any contributions issue that might affect a future withdrawal liability determination must be arbitrated under 29 U.S.C. § 1401. (Penske Reply, Dkt. No. 28, at 45.) But this cannot be the rule, as the federal courts have well-established jurisdiction to consider contributions cases brought by multiemployer funds. Specifically, 29 U.S.C. §§ 1132(e) and 1132(g)(2) expressly permit a fund to sue to collect any delinquent contributions and provides the Fund is entitled to recover, among other things, mandatory statutory damages as a penalty for the employer's failure to voluntarily pay the contributions. *See, e.g., Cent. States, Se. & Sw. Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1156 (7th Cir. 1989) (en banc).

As a result, reading 29 U.S.C. § 1401(a) as including not only "determinations made" under 29 U.S.C. §§ 1381–1399 but also encompassing any issue with potential "withdrawal liability implications" (Penske Reply, Dkt. No. 28, at 42) would almost entirely eviscerate ERISA contributions law. Indeed, Penske itself states that "every contribution issue has withdrawal liability implications." (*Id.*)

As a general matter, Penske is correct that contributions determinations tend to have withdrawal liability impacts.[2] For example, determining a withdrawing

---

[2] To be clear, Penske is not correct that every contributions issue has withdrawal liability implications. For example, the Fund's plan document provides for a ten year "lookback period" as permitted under 29 U.S.C. § 1399(c)(1)(C)(iii) (i.e., an employer's allocable share of unfunded vested benefits under 29 U.S.C. § 1391 will be based on the ten years of contribution history preceding the withdrawal year), such that contributions-related issues relating to before that ten year period may not have any withdrawal liability impact. But the vast majority of contributions cases involve contributions due within the last ten years.

employers' allocable share of a fund's unfunded vested benefits under 29 U.S.C. § 1391(b) (and the regulations promulgated thereunder) generally requires the Fund to compare the amount of contributions an employer was required to pay for the ten-year lookback period to the overall amount of contributions that the Fund has received over that time. *See generally Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co.*, 513 U.S. 414, 417 (1995) (summarizing 29 U.S.C. § 1391).[3] An employer's withdrawal liability payment schedule is similarly computed based on the contributions that an employer was obligated to make prior to its withdrawal. *See, e.g.*, 29 U.S.C. § 1399(c)(1)(C)(i)(I)-(II) (withdrawal liability payment scheduled based on highest amounts and highest rate at which employer "had an obligation to contribute" to a given fund). So, almost any issues relating to contributions (at least, in the Fund's case, for the 10 years prior to a withdrawal) will have an impact on the amount of withdrawal liability the employer will incur if it withdraws from a multiemployer plan.

With this in mind, it cannot be the rule that any contributions issue that has "withdrawal liability implications" must be arbitrated under 29 U.S.C. § 1401, as that would fly in face of the unambiguous conferral of federal court jurisdiction over actions for delinquent contributions under 29 U.S.C. § 1132 and deprive funds of their mandatory statutory damages under 29 U.S.C. § 1132(g)(2). (Penske Reply,

---

[3] The Fund generally uses the modified presumptive method described in 29 U.S.C. § 1391(b) to calculate an employer's allocable share of unfunded vested benefits. While there are other methods permitted by 29 U.S.C. § 1391, the differences between the various methods are not material for purposes of this dispute.

Dkt. No. 28, at 42.) It would further introduce significant ambiguity in the process—how is a fund (or a district court) to know if an employer who is delinquent in its contributions will withdraw in three, five, or ten years' time such that the issue involves "withdrawal liability implications" and triggers Penske's proposed rule? The correct approach is instead to follow the text of 29 U.S.C. § 1401(a), which states that only "determinations made" under the withdrawal liability provisions of 29 U.S.C. §§ 1381–1399 are subject to mandatory arbitration.

**B. Litigating Contributions Issues Is Proper Under the LMRA, ERISA, and MPPAA.**

Instead of directly responding to the Fund's point that 29 U.S.C. § 1401(a) only applies where a withdrawal liability determination has been made, Penske suggests that the Fund is involved in gamesmanship because the Fund has not assessed Penske with withdrawal liability. As an initial matter, that accusation cannot overcome the plain language of 29 U.S.C. § 1401(a) which, again, provides that 29 U.S.C. § 1401(a) only applies to a withdrawal liability determination. But, in any event, the Fund has little incentive to engage in gamesmanship, as "the withdrawing employer owes nothing [in terms of withdrawal liability] until the plan notifies it of its liability and demands payment." *Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. El Paso Co.*, 525 F.3d 591, 595 (7th Cir. 2008) (internal citation and quotation marks omitted). As such, there is no bad faith by the fund here, as it is Penske, not the Fund, that would benefit by the delay of the imposition of a withdrawal liability payment schedule. Instead, the Fund merely proposes that this nearly four-year-old litigation be brought to its

conclusion through a ruling on whether the Local 745 Group's participation ceased in 2021, as this may very well affect whether the Fund will issue a 2021 partial withdrawal liability assessment, as opposed to just a 2022 complete withdrawal liability assessment.

Moreover, Penske's claim of gamesmanship mischaracterizes the relevant sequence of events: Penske (not the Fund) filed this lawsuit seeking declaratory and injunctive relief, after which the District Court entered the TRO, which was then vacated. In the counterclaim, the Fund merely asked the District Court to tell the Fund what its rights and obligations are under these circumstances, including as it relates to whether the TRO was void *ab initio*. That is not gamesmanship—the Fund only asks this Court to take a piece of litigation initiated by Penske to its conclusion. Indeed, it is Penske that has sought a decision in federal court (not in an arbitration) that the Local 745 Group's contribution obligation did not cease in 2021 (Penske Reply, Dkt. No. 28, at 2-3), and Penske itself contends that such a ruling in its favor reduce its withdrawal liability by at least $10 million by eliminating a 2021 partial withdrawal. (Penske Verified Complaint, D. Ct. Dkt. No. 1, ¶ 71). Penske fails to explain its paradoxical position that its claim for relief (despite that claim's clear withdrawal liability impact) does not implicate 29 U.S.C. § 1401 but that the Fund's counterclaim for a declaratory judgment on the same issue does.

To support its claim of gamesmanship and its argument that the Fund's counterclaim under 29 U.S.C. § 185(a) must be swept into arbitration, Penske misreads two out-of-circuit cases. (*See* Penske Reply, Dkt. No. 28, at 41 n.17.)

Indeed, the actual holding of *Simon v. Pfizer Inc.*, is that "a claim that is truly outside of an arbitration agreement . . . cannot be forced into arbitration, even though there may be factual allegations in common" with claims subject to arbitration requirements. 398 F.3d 765, 776 (6th Cir. 2005). The Sixth Circuit went on to conclude that the plaintiff's "Section 510 claim and COBRA claim are not simply claims . . . that have been recharacterized in order to avoid arbitration; rather, they are independent claims that are statutorily authorized and that depend upon different legal standards." *Id.* at 777. So too here, as the Fund has a separate statutory authorization for its claim under 29 U.S.C. § 185(a), and 29 U.S.C. § 1401(a) does not apply. And in *Catholic Health Partners v. CareLogistics, LLC*, the district court's concern was the misuse of a declaratory judgment filing to win the "race to the courthouse." 973 F. Supp. 2d 787, 792 (N.D. Ohio 2013). The Fund's request for declaratory judgment, on the other hand, merely asks for a federal court to fully decide the issues before it, including the impact of the TRO and the District Court's subsequent vacating of the same.

Moreover, and unlike the state-law claims considered in the cases cited by *Rail Terminal*, 2019 WL 2326002 at *2 (citing *Jass v. Prudential Health Care Plan, Inc.*, 88 F.3d 1482, 1491 (7th Cir. 1996) and *Leu v. Norfolk & W. Ry. Co.*, 820 F.2d 825, 830 (7th Cir. 1987)), the Fund's counterclaim is properly brought under 29 U.S.C. § 185(a) in furtherance of the Fund's fundamental duties to determine how the Fund should treat the moneys paid by Penske after December 25, 2021 and to what extent Penske's Local 745 Group employees are entitled to pension credit for

the post-2021 period. *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 572–73 (1985). Put differently, although there is a policy in favor of arbitration under the MPPAA, there is also a policy under ERISA (and the LMRA) more generally that a multiemployer fund should promptly determine the amount of contributions owed to it and the benefits owed to its members. *Id.*; *see also* 29 U.S.C. § 1132(e).

And, contrary to Penske's arguments, federal court adjudication of the Fund's counterclaim does not implicate the policy interests underlying the arbitration requirements of MPPAA. (Penske Reply, Dkt. No. 28, at 45). Penske correctly points out that part of the reason for MPPAA's arbitration scheme is that arbitrators specializing in withdrawal liability will be able to decide withdrawal liability-related issues quickly and competently. (Penske Reply, Dkt. No. 28, at 43.) But that policy behind MPPAA does not extend to determinations with respect to the effect of the District Court's TRO and the later vacating of the same. Those are issues relating to federal courts and civil procedure for which a withdrawal liability arbitrator would have no particular expertise.

Accordingly, *Lancaster v. Norfolk & Western Railway Co.*, 773 F.2d 807 (7th Cir. 1985), is a far better guide for the Court than the misapplied preemption cases relied upon by *Rail Terminal*, as the *Lancaster* decision noted that the plaintiff could proceed in federal court in part because the nature of the questions presented meant that "arbitration would have no advantage over adjudication in this case." 773 F.2d at 816. The same is true here, as the legal questions presented are not

issues typically decided by an arbitrator. To the contrary, and as discussed above, the issue of the effectiveness of the Trustees' expulsion decision, including the effect of the District Court's TRO thereon, are questions best answered in federal court. In any event, and as explained above, 29 U.S.C. § 1401(a) does not apply in the first place, as no withdrawal liability determination has been made here.

## III.    The Decision to Expel the Local 745 Group Is Effective.

### A. The Court Should Hold that the Expulsion Decision Is Effective December 25, 2021 Notwithstanding the TRO.

Penske complains that the Trustees did not take sufficient action to "effectuate" their decision expelling the Local 745 Group but fails to point to any separate "effectuation" action required under the Trust Agreement. (Penske Reply, Dkt. No. 28, at 48–49.) In any event, the Expulsion Provision provides that the Trustees' decision is self-effectuating:

> . . . any such rejection and/or termination . . . shall be effective as of the date determined by the Trustees (which effective date may be retroactive to the initial date of the term of the rejected agreement) and shall result in the termination of the affected group and all Employees of the Employer in the affected group from further participation in the Fund on and after such effective date.

(Trust Agreement, Art. IV, § 20, CSPF Sep. Appx. at 0023.) Here, the effective date chosen by the Trustees was December 25, 2021, and no additional action was needed to further "effectuate" that result.

Moreover, Penske mischaracterizes the thrust of the Fund's argument. The issue is not whether "the Trustees made the decision and tried to retroactively expel the Local 745 group" (Penske Reply, Dkt. No. 28, at 48), but rather the effect (if any) of the vacated TRO on the effective date of the Trustees' decision. (Fund's Initial

Brief, Dkt. No. 20, at 50–51.) To be clear, the TRO should not affect the termination date of the Local 745 Group, first, because it was later voided and, second, because it was invalid *ab initio* for failure to address the bond requirement of Federal Rule of Civil Procedure 65(c). As to the first reason, the black-letter law is that a TRO is not intended to be a permanent adjudication of the parties' rights, and that later vacating such an order is a "procedure [that] clears the path . . . the rights of all parties are preserved; none is prejudiced by a decision which in the statutory scheme was only preliminary." *United States v. Munsingwear, Inc.*, 340 U.S. 36, 40 (1950); *see also, e.g.*, *Hewitt v. United States*, 145 S. Ct. 2165, 2173 (2025) ("[V]acated court orders are void *ab initio*."); *Medici v. City of Chi.*, 856 F.3d 530, 533 (7th Cir. 2017) (vacatur has the effect of "erasing" a legal order as though it had "never been written"). Accordingly, the Court should hold that, because it was vacated, the TRO did not prevent or delay the expulsion of the Local 745 Group through the self-effectuating decision of the Trustees.

As to the second reason, "Rule 65(c) makes the injunction's effectiveness depend on a bond." *BankDirect Cap. Fin., LLC v. Cap. Premium Fin., Inc.*, 912 F.3d 1054, 1058 (7th Cir. 2019). Here, there was no bond determination at all in the TRO, meaning that even if the TRO was never vacated, it could not operate to prevent or delay Penske's expulsion in the first place. *DDI Seamless Cylinder Int'l, Inc. v. Gen. Fire Extinguisher Corp.*, 14 F.3d 1163, 1166 (7th Cir. 1994) (describing unenforceable orders as having "no binding effect"). Penske has made no response to

these two arguments, despite their appearance in the Fund's opening brief. (Fund's Initial Brief, Dkt. No. 20, at 50–51.)

### B. Penske's Arguments Regarding the "Acceptance" or "Refund" of Certain Payments Are Irrelevant and Incorrect.

Rather than addressing the Fund's arguments, Penske focuses on the red herring of whether the Fund has "refunded" or "accepted" certain contributions payments from Penske. These concerns are of no moment because the Trustees decided that "unless Penske accepts the proposal that a 2022 withdrawal of the Local 745 group will be treated as a 2021 withdrawal by December 22, 2021, the participation of Penske's Local 745 group in the Fund shall terminate effective December 25, 2021." (CSPF Sep. Appx. at 0066-0067.) Penske never accepted that proposal so, under the Trustees' decision, the Local 745 Group was terminated effective December 25, 2021, unless the District Court's TRO was valid and extended the termination date beyond December 25, 2021, despite later being vacated. Penske's arguments regarding the Fund's alleged acceptance of—and alleged failure to refund—Penske's 2022 contributions purportedly made on behalf of the Local 745 Group have no bearing on that central question.

But even if these two other issues raised by Penske were relevant, they would not affect the result. Penske's first claim, "[t]hat Central States has not refunded the contributions is evidence no expulsion occurred," is simply not correct. (Penske Reply, Dkt. No. 28, at 48.) Under Article XIV, Section 1 of the Fund's Trust Agreement, two conditions must typically be satisfied before the Fund can issue a refund of amounts paid by an employer: first, "a mistake of fact or law . . . as

determined by the Trustees," and second, a "request for credit . . . received within ten years after the related work history was billed." (Trust Agreement, Art. XIV, § 1, CSPF Sep. Appx. at 0029–30.) *See also* 29 U.S.C. § 1103(c) (prohibiting return of contributions payments unless plan administrator makes a finding of a mistake of law or fact by the employer).

There is no reason to believe that the first condition for a refund is satisfied, as Penske does not point to a mistake of law or fact necessitating the return of its contributions payments. Instead, Penske appears to have made the 2022 contributions for the Local 745 Group (including a payment made on April 12, 2022, after the TRO was vacated) in furtherance of Penske's legal strategy to argue that the contribution obligation for the Local 745 Group continued past the 2021 expulsion date. (*See* February 22, 2023 Declaration of Thomas Baxa, CSPF Sep. Appx. at 0319, ¶ 6.)

And under the second necessary condition for a refund under the Trust Agreement, Penske cannot receive a refund until it requests one. By letter dated May 2, 2022, Penske requested a refund for contributions paid to the Fund for the period of March 1, 2022 through May 2, 2022. (*See* Penske's Response to the Fund's Local Rule 56.1 Statement of Additional Facts, D. Ct. Dkt. No. 118, ¶ 7.) As Penske admitted, however, Penske withdrew this request before the Trustees considered it. (*Id.*) Penske never requested a refund of contributions paid prior to March 1, 2022. (*Id.*) Nor were there were any other requests for refund of any kind besides the withdrawn request of May 2, 2022. (*Id.*). Thus, the fact that no refund has been

issued is, if anything, the result of Penske's own legal maneuvering, rather than evidence that the Local 745 Group remained in the Fund in 2022.

Penske's statement that "Central States continued to accept Penske's contributions for its Local 745 group" similarly is both incorrect and irrelevant. (Penske Reply, Dkt. No. 28, at 49.) As an initial matter, the Fund did not "accept" the payments in question. The contributions payments made by Penske in 2022 were all accomplished via monthly automated clearinghouse transfers (each such transfer, an "ACH Transfer"). (*See* Penske's Response to the Fund's Local Rule 56.1 Statement of Additional Facts, D. Ct. Dkt. No. 118, ¶ 26.) Accordingly, it was not possible for the Fund recipient to "reject" such a transfer. (Fund's Local Rule 56.1 Statement of Additional Facts, D. Ct. Dkt. No. 113, ¶¶ 26–28.) And, even if it were possible for the Fund to "reject" an ACH Transfer, the payments in question were lump sum payments containing all of Penske's contributions for a given month, so any "rejection" would have meant that the Fund would have rejected the entire payment, including contributions owed for Penske's groups that had not yet withdrawn when the payments were received. (*Id.*, ¶ 28.)

## IV. Unless the Court Finds that the Local 745 Group Was Expelled Effective in 2021, the District Court Should Retain Jurisdiction.

Penske mischaracterizes the Fund's alternative request that—should this Court affirm the District Court's refusal to rule on the Fund's counterclaim or otherwise reach any other ruling on that counterclaim other than a ruling that the Local 745 Group was expelled effective in 2021—the District Court should be ordered to retain jurisdiction to address the "classic harm" that would ensue if there

is a determination that the TRO extended the effective date of the Local 745 Group's termination into 2022. (*See* December 23, 2021 Tr., CSPF Sep. Appx. 0275, at 24:12–18 (the harm suffered by the fund through the loss of tens of millions of dollars in withdrawal liability due to there no longer being a 2021 partial withdrawal would be a "classic harm" to be remedied by money damages.)) Specifically, Penske's claim that the present appeal "does not encompass the district court's decision on the preliminary injunction—a decision that included a ruling not to require a bond" is a red herring. (Penske Reply, Dkt. No. 28, at 50.)

The question presented by Count II of the Fund's counterclaim is not whether the District Court's decision to not require a bond was correct, but rather the legal effect (if any) of the TRO given that the TRO was later vacated and further given that the TRO did not address Rule 65(c) at all despite this Court's holding that "Rule 65(c) makes the injunction's effectiveness depend on a bond." *BankDirect,* 912 F.3d at 1058. And, certainly, a district court can enter rulings relating to its own prior order even where an appeal relating to that order has been deemed moot by this Court. For example, in *Mitchell v. Wall*, 808 F.3d 1174, 1176 (7th Cir. 2015), this Court held that a district court's jurisdiction "includes the jurisdiction to vacate [an order], on the ground that our ruling [plaintiff's] appeal moot deprived her of an opportunity to challenge [the district court's] earlier ruling." This case is slightly different in that the District Court has already vacated the TRO, but there is still no reason why the dismissal of the prior appeal as moot should prevent the District Court from clarifying the effect of its TRO and its order vacating the same.

And, if this Court, the District Court, or a subsequent arbitrator ultimately finds that the TRO did have the legal effect of extending the Local 745 Group's termination date into 2022, then the Fund should be entitled to seek a remedy of the "classic harm" that the District Court itself acknowledged would result from that finding. *See, e.g.*, *BankDirect*, 912 F.3d at 1059 (ordering district court to award damages to enjoined party, even for periods during which enjoining party had not posted a bond). Indeed, "[t]he Supreme Court has long ago observed that 'the right to recover what one has lost by the enforcement of a judgment subsequently reversed is well established.'" *Vera v. Banco Bilbao Vizcaya Argentaria, S.A.*, 946 F.3d 120, 143 (2d Cir. 2019) (quoting *Balt. & O.R. Co. v. United States,* 279 U.S. 781, 786 (1929)). But, if the District Court does not retain jurisdiction to hear any claims by the Fund to recover this potential "classic harm," then it is unclear what forum (if any) would have jurisdiction to hear such a claim. And Penske's claim that *Buttron v. Sheahan* has no applicability here (Penske Reply, Dkt. No. 28, at 51) is incorrect, as in that case the court correctly noted that district courts "retain jurisdiction to administer complete relief and do full justice in" matters before them. No. 00-cv-4451, 2001 WL 111028, at *3 (N.D. Ill. Feb. 2, 2001).

Further, Penske appears to assert that the Fund does not have Article III standing in relation to its request for alternative relief. (Penske Reply, Dkt. No. 28, at 50.) As an initial matter, if the Fund's request for alternative relief is granted, the District Court would not need to rule on the Fund's claims for damages from the

harm resulting from the TRO unless and until the Fund actually incurs that harm due to a ruling that the TRO extended the Local 745 Group's termination date into 2022. Put another way, the Fund is simply asking the District Court to retain jurisdiction so the Fund has a forum to seek to recover its damages if and when those damages are incurred.

In any event, "the fact that a loss or other harm on which a suit is based is probabilistic rather than certain does not defeat standing." *MainStreet Org. of Realtors v. Calumet City*, 505 F.3d 742, 744 (7th Cir. 2007). Here, the harm asserted is sufficiently probable to already confer standing: Penske itself insists that a withdrawal liability assessment and arbitration are near-certainties if the Fund prevails. (Penske Reply at 38.) Penske also continues to reserve the right to assert the very argument that concerns the Fund (*i.e.*, that the TRO extended the Local 745 Group's participation into 2022). (*See* Penske Reply at 50.) This Court should not permit Penske to use the TRO as a shield—by crediting Penske's claim that the prospect of this argument is too vague to be addressed—while on the other hand allowing Penske to maintain its argument regarding the TRO as a sword for later use.

For the avoidance of doubt, Penske is incorrect insofar as it argues that damages resulting from the TRO would be available under 29 U.S.C. § 1401(b)(2) following an arbitrator's decision (Penske Reply, Dkt. No. 28, at 51), as that provision only allows a district court to "to enforce, vacate, or modify the arbitrator's award," and does not confer jurisdiction to rule in connection with a previous district court

order. Instead, the proper forum to consider the effect of the TRO is in federal court in the first instance.

In sum, the Court should avoid a ruling whereby Penske obtains through a procedural quirk of the timing of the TRO that which it cannot win on the merits, especially where the TRO was entered without complying with Rule 65(c) and was later vacated. The best way to achieve that result is to hold that the Local 745 Group was indeed expelled effective December 25, 2021. But, in the alternative, the District Court can retain jurisdiction to determine the effect of its own TRO upon the Fund and, if necessary, the scope of the "classic harm" the District Court identified under its well-established jurisdiction over its own prior orders, in this case the TRO. *See Travelers Indem. Co.*, 557 U.S. at 151.

**[Remainder of Page Intentionally Left Blank]**

## CONCLUSION

For the reasons set forth in the Fund's initial brief (Dkt. No. 20), the Court should affirm the District Court's Opinion insofar as it granted the Fund summary judgment with respect to Penske's claim for declaratory judgment and with respect to the Fund's counterclaim for attorneys' fees. Additionally, the Court should instruct the District Court to award the Fund its attorney's fees and costs incurred in this appeal.

As it relates to the Fund's cross-appeal, the Court should reverse the District Court's Opinion insofar as it granted Penske's motion to dismiss the Fund's counterclaim for declaratory judgment and should remand to the District Court with instructions to enter a declaratory judgment in the Fund's favor on both the jurisdictional issue and the merits.

September 10, 2025                          Respectfully submitted,

                                           */s/Daniel Sullivan*

                                           Daniel E. Sullivan
                                           CENTRAL STATES FUNDS
                                           8647 W. Higgins Road
                                           Chicago, Illinois 60631
                                           847-582-5078
                                           Dsulliva@centralstatesfunds.org
                                           *ATTORNEY FOR CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND AND ITS TRUSTEES*

FV: 472836857 / 25000010 / 9/10/2025

20

## FEDERAL RULE OF APPELLATE
## PROCEDURE 32(g) CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 28.1(a) and Circuit Rule 28.1. Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(f), the word counting function of Microsoft Word (Version 2408, Build 17928.20654) states that applicable portions of this brief contain 5481 words.

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32(b), as well as the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this brief has been prepared in 12-point Century Schoolbook, double-spaced.

Respectfully submitted,

/s/ *Daniel E. Sullivan*
Daniel E. Sullivan

## CERTIFICATE OF SERVICE

I, Daniel E. Sullivan, hereby certify that on September 10, 2025, I electronically filed the foregoing Central States' Cross-Appeal Reply Brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Daniel E. Sullivan*
Daniel E. Sullivan